953 F.2d 33
 Balbina RODRIGUEZ; Susan Riley; Teresa Gonzales; Ana
Fernandez; Donna Wade; Mary Harvey, on behalf of
themselves and all others similarly
situated, Plaintiffs-Appellees,
v.
Mario CUOMO, individually and as Governor of the State of
New York; Cesar Perales, individually and as
Commissioner of the New York State
Department of Social Services,
Defendants-Appellants.
 No. 1260, Docket 90-9092.
 United States Court of Appeals,
Second Circuit.
 Argued April 8, 1991.
Decided Jan. 7, 1992.
 
 Lawrence S. Kahn, Deputy Sol. Gen., New York City (Robert Abrams, Atty. Gen. of the State of N.Y., Robert J. Schack, Judy E. Nathan, Asst. Attys. Gen., New York City, of counsel), for defendants-appellants.
 John T. Hand, White Plains, N.Y. (Michael D. Hampden, Westchester Legal Services, Inc., White Plains, N.Y., Steven Telzak, Glennia R. Campbell, Bronx Legal Services, Inc., New York City, of counsel), for plaintiffs-appellees.
 Before CARDAMONE and MAHONEY, Circuit Judges, and PARKER, District Judge.*
 CARDAMONE, Circuit Judge:
 
 
 1
 Any time analysis is undertaken of a federal assistance program we inevitably are faced with a legislative morass, created by complex statutes and regulations that spawn confusing and esoteric arguments. Yet, the complicated nature of the legal problems presented should not obscure the harsh choices at the human level that they represent. On this appeal we must construe a federal aid program designed to help low-income households pay for heating their homes. At issue is a New York State regulation which effectively ruled that one group of the poor is more in need of assistance than another. The question is whether in light of the limited federal funds available may aid be given to those the state deems most in need, even though this results in others also in need not being provided for? In the best of all possible worlds the needs of all would be met. Unfortunately, we do not rule in such a world and, as a consequence, think the answer to the question is "yes."
 
 BACKGROUND
 
 2
 The assistance program at issue began in 1981 when Congress revamped a 1980 emergency home energy aid bill and established in its place a block grant program of federal aid. The Low-Income Home Energy Assistance Act of 1981 (Low-Income Energy Act or Act), 42 U.S.C. §§ 8621 et seq., makes grants to the states, which distribute these funds (Home Energy Assistance Program or "HEAP" funds) to eligible households. New York State participates in this program, see N.Y.Soc.Serv.Law § 97 (McKinney Supp.1990), and must assure the federal government annually that it will administer the HEAP funds it receives in accordance with the conditions set forth in 42 U.S.C. § 8624(b), which provides:
 
 
 3
 As part of the annual application required by subsection (a) of this section, the chief executive officer of each State shall certify that the State agrees to--
 
 
 4
 (1) use the funds available under this subchapter for the purposes described in section 8621(a) of this title and otherwise in accordance with the requirements of this subchapter, and agrees not to use such funds for any payments other than payments specified in this section;
 
 
 5
 (2) make payments under this subchapter only with respect to--
 
 
 6
 (A) households in which 1 or more individuals are receiving [AFDC, supplemental Social Security, food stamps, or veterans benefits]; or
 
 
 7
 (B) households with incomes which do not exceed the greater of--
 
 
 8
 (i) an amount equal to 150 percent of the poverty level for such State; or
 
 
 9
 (ii) an amount equal to 60 percent of the State median income;
 
 
 10
 except that no household may be excluded from eligibility under this subclause for payments under this subchapter ... if the household has an income which is less than 110 percent of the poverty level for such State for [the] fiscal year....
 
 
 11
 (5) provide, in a timely manner, that the highest level of assistance will be furnished to those households which have the lowest incomes and the highest energy costs in relation to income, taking into account family size, except that the State may not differentiate in implementing this section between the households described in clause (2)(A) and (2)(B) of this subsection....
 
 
 12
 (8) provide assurances that (A) the State will not exclude households described in clause (2)(B) of this subsection from receiving home energy assistance benefits under clause (2), and (B) the State will treat owners and renters equitably under the program assisted under this subchapter....
 
 
 13
 The Act defines "household" as "any individual or group of individuals who are living together as one economic unit for whom residential energy is customarily purchased in common or who make undesignated payments for energy in the form of rent." Id. at § 8622(2) (emphasis added). So long as minimal requirements established under the Act are met, the states are free to design their own programs. One such requirement is that the annual plan the states submit to the federal government must describe "the eligibility requirements to be used by the State" distributing HEAP Funds. Id. at § 8624(c)(1)(A).
 
 
 14
 Over the years federal funds for the HEAP program were cut substantially. New York responded by promulgating the regulation challenged on this appeal, 18 N.Y.Comp.Codes R. & Regs. (NYCRR) § 393.4(c)(3)(i), effective as of February 27, 1989. It states that
 
 
 15
 (3) For purposes of the current HEAP State Plan ... households in the following living arrangements shall be ineligible to receive benefits under HEAP:
 
 
 16
 (i) tenants of government subsidized housing with heat included in their rent.
 
 
 17
 Under New York's HEAP plan subsidized housing is any housing that receives a subsidy based on income that reduces the household's monthly rental payment. This definition encompasses two types of subsidy: public housing and "Section 8" housing. There is also a Section 8 voucher program, but as none of the plaintiffs receives these vouchers it is unnecessary to describe that program.
 
 
 18
 The regular Section 8 program requires a tenant (not in public housing) who does not receive public assistance to pay as rent the greater of (1) 30 percent of the family's monthly adjusted income or (2) 10 percent of the family's monthly income. 42 U.S.C. § 1437a(a)(1)(A), (B); 24 C.F.R. § 813.107(a)(1), (2). The tenant who receives public assistance--but is not in public housing--pays the greater of either measure above or that part of the tenant's public assistance grant specifically allocated to shelter. 42 U.S.C. § 1437a(a)(1)(C); 24 C.F.R. § 813.107(a)(3). A tenant in New York on public assistance pays the latter amount because New York allocates a specific portion of the public assistance grant to shelter. 18 NYCRR § 352.3(a). The Public Housing Authority pays the remainder of the rent. See 24 C.F.R. § 813.102. Similar rules based on incomes or shelter allowances apply to the rent paid by tenants of public housing. See 24 C.F.R. § 913.107; 9 NYCRR § 1627-2.6(c)(5)(i); 18 NYCRR § 352.3(a), (d). The Public Housing Authority establishes a utility allowance for any utilities not included in the rent, which is then subtracted from the rent to be paid by the household. See 24 C.F.R. §§ 813.102, 913.102.
 
 PRIOR PROCEEDINGS
 
 19
 The six plaintiffs are residents of government subsidized housing who are not billed separately for heat but pay separately for non-heat related utilities. Each plaintiff is a beneficiary of a utility allowance for utilities other than heat. The challenged state regulation makes the plaintiffs ineligible for HEAP assistance, despite the fact that all have incomes that are less than 110 percent of the poverty level for New York State. The plaintiffs asked the United States District Court for the Southern District of New York (Broderick, J.), to declare that the New York regulation violates The Low-Income Energy Act and the Equal Protection and Due Process Clauses. In an order dated November 9, 1990 the district court held that the regulation violated clauses (b)(8) and (f)(1) of the Act, but did not reach or decide the constitutional claims. 751 F.Supp. 363 (S.D.N.Y.1990).
 
 
 20
 The Governor of New York State and the Commissioner of the New York State Department of Social Services appeal from that judgment. Meanwhile, the district court approved a stipulation partially staying its order, under which the state set aside $7.5 million to pay benefits, if payment is held to be required. Further, the state's obligation, if any, to pay these HEAP benefits has been stayed until 30 days following the disposition of this appeal. We now reverse.
 
 ANALYSIS
 
 21
 For purposes of consistency and clarity 42 U.S.C. § 8624(b) will be referred to as a subsection, (b)(2) as a clause, and (b)(2)(B) as a subclause. The first question to be addressed is whether either clause (b)(2) or clause (b)(8) of the Act requires that all households described in subclause (2)(B) receive at least some HEAP benefits. The district court held that, "absent some other overriding clause, every household described in 42 U.S.C. § 8624(b)(2)(B) must receive some part of the federal funds ... [s]o long as [they] are ... paying, directly or indirectly, for some part of their heating costs." 751 F.Supp. at 365. In other words, as we read it, the trial court held that all households below 150 percent of the State poverty level or below 60 percent of the State median income must receive at least some aid. This is not what plaintiffs urge on appeal. Instead, they argue only that all households below 110 percent of the State poverty level must receive some assistance. We discuss the district court's view first, because if its holding is correct then argument respecting the 110 percent floor becomes irrelevant, since those families whose income is below 110 percent of the poverty level necessarily also fall below 150 percent of the poverty level.
 
 I Clause (b)(8)
 
 22
 The district court's legal conclusions on an appeal from a grant of summary or declaratory judgment are ordinarily reviewed de novo. See Burtnieks v. City of New York, 716 F.2d 982, 985 (2d Cir.1983). It concluded that because under clause (b)(8) the state must provide assurances that it will not exclude households described in subclause (2)(B) from receiving home energy assistance benefits under clause (2) [requiring the state's assurance it will give HEAP funds only to persons receiving some form of public assistance or who meet the income qualifications], the State must give some part of the HEAP funds to "every household described in" that subclause. 751 F.Supp. at 365.
 
 
 23
 We disagree with the district court's reading of the statute. Several problems spring from reading clause (b)(8) to preclude the state from excluding households meeting the income criteria set forth in subclause (2)(B) from receiving aid. First, as the district court itself recognized, the state "has some leeway in defining which households will be eligible to receive HEAP funds[, though] it may not ... draw the eligibility line above the 150% poverty level figure or below the 110% poverty level figure." 751 F.Supp. at 364. Such reasoning implies that the state could draw the income eligibility line at, for example, 130 percent of the poverty level figure, excluding from eligibility (and therefore benefits) all families whose income exceeded that level.
 
 
 24
 Second, it would make little sense to enact the subclause (2)(B) floor on income eligibility--"no household may be excluded from eligibility ... if the household has an income which is less than 110 percent" of the state poverty level--if Congress' purpose in enacting clause (b)(8) was to make 150 percent of the state poverty level or 60 percent of the state median income not only a ceiling on aid but also a floor. In light of these difficulties, we regard clause (b)(8) as sufficiently ambiguous so that we may appropriately turn to legislative history for aid in its interpretation. See Blum v. Stenson, 465 U.S. 886, 896, 104 S.Ct. 1541, 1547-48, 79 L.Ed.2d 891 (1984).
 
 
 25
 This legislative history contradicts the district court's reading of the statute. In 1980 the House Conference Report stated that "[t]he conferees ... wish to make clear that a State is not required, under its plan, to provide a benefit to every household defined as an eligible household under this title." Joint Committee Statement, H.R.Conf.Rep. No. 817, 96th Cong., 2d Sess. 154 (1980), reprinted in 1980 U.S.Code, Cong. & Admin.News 410, 642, 705. When the Act was amended in 1984 to add clause (b)(8), the Senate Report filed by the Labor and Human Resources Committee stated expressly that the Committee only intended the section to ensure that families described in subclause (2)(B) "have access to the program and are not categorically excluded." S.Rep. No. 484, 98th Cong., 2d Sess. 19 (1984), reprinted in 1984 U.S.Code, Cong. & Admin.News 4847, 4861. The Committee declared this provision was not designed to "require the payment of benefits to every non-welfare, income eligible family, nor is it the intent to require States to make identical or rigidly proportional payments to welfare and non-welfare households determined eligible by the State." Id. at 4860.
 
 
 26
 In fact, the Committee Report notes only that[subclause] (2)(B) describes a class of households by income-based criteria, as opposed to [sub]clause (2)(A), which categories certain households by their participation in other federal assistance programs.... [T]he election by the State of which of the identified group[s] it intends to serve does not imply any relative or obsolute [sic] level of payments to members of those groups. Indeed, [clause] (b)(5) makes clear that in actually distributing funds, States are to channel the greatest levels of assistance, "in a manner consistent with the efficient and timely payment of benefits," to "households which have the lowest incomes and the highest energy costs in relation to income, taking into account family size." Thus, the State may well target its funds, within the 60-percent of-State-median-income group, for example, to give the most money to those at the lower end of the scale as determined by the (b)(5) criteria, while giving little or no assistance at all to those at the upper end. In summation, the simple designation of a (b)(2) category or categories to be served, or as eligible, does not bind the State to actually give financial assistance to all members of the category, though of course it may do so in the exercise of its discretion.
 
 
 27
 Id. (emphasis added).
 
 
 28
 This legislative history is crystal clear, and it directly conflicts with the district court's view. We therefore conclude that clause (b)(8) does not require the states to provide at least some HEAP funds to a household simply because it satisfies the income criteria set forth in subclause (2)(B)--that is, clause (b)(8) does not mean that the state must provide assurances that it "will not exclude [any] household[ ] described in [sub]clause (2)(B) ... from receiving home energy assistance benefits." Because the structure of the statute and its legislative history make clear that a household is not entitled to HEAP assistance simply by virtue of having an income below 150 percent of the state's poverty level or 60 percent of the state's median income, it may not be said that clause (b)(8) requires all such households receive some HEAP aid. And, because we conclude that subclause (2)(B) does not necessarily prevent states from deeming ineligible for HEAP funds households that have an income below 110 percent of its poverty level, see infra, at 39-42, it follows that clause (b)(8) does not guarantee at least some HEAP funds to all such households. Cf. United States v. Ron Pair Enterprises, Inc., 489 U.S. 235, 242, 109 S.Ct. 1026, 1031, 103 L.Ed.2d 290 (1989) (construction of statute generally should comport with its legislative history and purpose).
 
 
 29
 Further, insofar as receipt of assistance necessarily presupposes eligibility, clause (b)(8) must be read as incorporating subclause (2)(B). Thus, clause (b)(8) may be construed as demanding only an assurance from the state that it will not deny benefits to (2)(B) households which satisfy other valid non-income-based eligibility requirements as well. In other words, clause (b)(8) does not itself mandate that all (2)(B) households receive some HEAP aid. Rather, clause (b)(8) requires receipt of HEAP aid only for (2)(B) households that the state otherwise (validly) determines to be eligible.
 
 
 30
 Or, put another way, subclause (2)(B) ensures that a household whose income is under 110 percent of the state's poverty level (or some greater income cut-off level chosen by the state that is not more than 150 percent of its poverty level or 60 percent of its median income) may not be deemed ineligible for HEAP funds solely by virtue of income. If--in addition to meeting these income-eligibility requirements--a household satisfies the state's other legitimate non-income-based eligibility requirements (i.e., eligibility requirements that satisfy clause (b)(5) as designed to ensure "that the highest level of assistance will be furnished to those households which have the lowest incomes and the highest energy costs in relation to income," see infra, at 40-42), then clause (b)(8) requires receipt of at least some HEAP aid. This aid requirement exists regardless of the reasons proffered by the state for denying benefits. Compare clause (b)(5) (explicitly prohibiting states from differentiating between (2)(B) and (2)(A) households in implementing HEAP program); see also United States v. Dinerstein, 362 F.2d 852, 855-856 (2d Cir.1966) (construction preferred which leaves to each element of a statute a function different in some way from the others). Clause (b)(8) thereby ensures that income-eligible households are not denied HEAP assistance solely by virtue of income. Cf. S.Rep. No. 484, 98th Cong., 2d Sess. 18-19 (1984), reprinted in 1984 U.S.Code, Cong. & Admin.News 4847, 4860-61 (non-welfare poor should not be denied HEAP aid merely because they do not receive other public assistance); see also infra, at 40, 42.
 
 
 31
 In sum, the interaction of subclause (2)(B) and clause (b)(8) limits the state's discretion in establishing income eligibility requirements and defining classes entitled to benefits, see infra, at 40-42, though no household is automatically to receive or be precluded from receiving HEAP aid solely by virtue of having an income level within the range of (2)(B). Clause (b)(5) ensures that non-welfare poor are not treated less favorably than recipients of public assistance (solely by virtue of this difference) in the administration of a HEAP plan; and clause (b)(8) provides even greater protection to income-eligible households that are otherwise eligible for HEAP benefits by ensuring payment of HEAP aid to such households, regardless of whether non-payment discriminates in favor of public assistance recipients. Consequently, we conclude that 1) a state may choose not to allocate funds to income-eligible households whose incomes lie at the upper end of the subclause (2)(B) range, and 2) clause (b)(8), by itself, imposes no requirement that households whose incomes lie below the income-eligibility cut-off level chosen by the state must receive some funds.
 
 
 32
 We now turn to address the question, alluded to above, of whether a state may indirectly (through non-income-based eligibility requirements) choose not to allocate funds to households whose incomes lie at the lowest end of the subclause (2)(B) range, i.e., those whose incomes fall below 110 percent of the state's poverty level. Plaintiffs contend that subclause (b)(2)(B) of the Act sets an absolute 110 percent floor, so that the state must provide benefits to any household whose income falls below 110 percent of the state poverty level. The state responds that the provision was intended only to place a floor on income eligibility, thus restricting the states from promulgating any income eligibility floor at less than 110 percent of the state poverty level. Nonetheless, the state continues, the subclause leaves the states free to draw other eligibility restrictions, such as 18 NYCRR § 393.4(c)(3)(i), which incidentally exclude households whose incomes fall below the 110 percent floor.
 
 II Subclause (b)(2)(B)
 A. Standard of Review
 
 33
 Before addressing the precise question at hand, it is necessary to determine the applicable standard of review or, more precisely, whether we should accord deference to the state's interpretation of subclause (b)(2)(B). The background and structure of this kind of block grant statute make determining a reviewing court's role somewhat difficult. Originally the Act was passed as part of the Crude Oil Windfall Profit Tax Act of 1980, Pub.L. 96-233, 94 Stat. 288 et seq. In 1981 Congress repealed the 1980 Act, replacing it with a fiscally fitter version that trimmed away a number of the regulations governing how energy assistance funds were distributed. See Clifford v. Janklow, 733 F.2d 534, 536 (8th Cir.1984). This emphasis on structure grew of the Reagan Administration's desire to allocate funds to the states in the form of block grants so that they could be used efficiently in meeting the differing needs of local communities. See Views of the Committee on Labor and Human Resources, S.Rep. No. 139, 97th Cong., 1st Sess. 908 (1981), reprinted in 1981 U.S.Code, Cong. & Admin.News 396, 932-33.
 
 
 34
 Consistent with the block grant nature of the HEAP program, interpretive authority was placed not as it usually is in the Secretary, but instead in the states themselves. Id. at 933-35 ("the committee intends that States be provided with the broadest possible latitude in the use of block grant funds and be free from all but the most minimal and necessary federal administrative and regulatory direction.... the general offect [sic] will be to return basic control and responsibility to the State level"). The Senate Report noted that the Secretary of Health and Human Services "is specifically directed not to interpret [the Act's] requirements by regulation or otherwise go beyond the explicit boundaries of the limited federal role clearly defined in the bill." Id. at 932.
 
 
 35
 The Secretary has followed this directive when issuing regulations, stating that in handling complaints about a state's use of its grant, the Department will defer to a state's interpretation of the statute "unless the interpretation is clearly erroneous." 45 C.F.R. § 96.50(e). The same regulation provides that "[t]he Department recognizes that under the block grant programs the States are primarily responsible for interpreting the governing statutory provisions. As a result, various States may reach different interpretations of the same statutory provisions. This circumstance is consistent with the intent of and statutory authority for the block grant programs." Id.
 
 
 36
 This legislative history makes it apparent that Congress wanted the states to bear the primary responsibility for interpreting the Act's requirements. Hence, when reviewing the distribution of funds under the Low-Income Energy Act, the states stand in much the same position as would a federal administrative agency given authority over an analogous federally-controlled program. This follows because the administration of the block grants " 'necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress.' " Chevron, USA, Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984) (quoting Morton v. Ruiz, 415 U.S. 199, 231, 94 S.Ct. 1055, 1072, 39 L.Ed.2d 270 (1974)). Here, Congress explicitly left at least some gaps for the states to fill. The legislative history and the structure of the program indicate "there is an express delegation of authority ... to elucidate" the statutory provisions governing the distribution of aid within the context of the needs of the particular state. See id. 467 U.S. at 843-44, 104 S.Ct. at 2782.
 
 
 37
 Nonetheless, determining Congress' purpose in enacting the 110 percent floor is not a matter of interstitial rule-making left to the states. Rather, because the 110 percent floor is a requirement imposed on all states--no matter what their local circumstances--its "interpretation ... should be uniform among all states." Rural Alaska Community Action Program v. Smith, 847 F.2d 535, 537 (9th Cir.1988) (deciding standard of review for similar block grant program with nearly identical legislative history). Because it was Congress' purpose that the floor either be absolute or not absolute, ascertaining its aim in enacting subclause (b)(2)(B) is a matter that requires statutory interpretation--the exclusive province of the courts.
 
 B. Plain Meaning
 
 38
 As in all cases of pure statutory interpretation the face of the statute is examined first. See Blum, 465 U.S. at 896, 104 S.Ct. at 1547-48. The provision at issue--part of subclause 2(B) added as a 1984 amendment to the Act--states that "no household may be excluded from eligibility under this subclause for payments under this subchapter ... if the household has an income which is less than 110 percent of the poverty level for such State." 42 U.S.C. § 8624(b)(2)(B). Plaintiffs say this language is straightforward--the state cannot adopt any eligibility restriction that directly or indirectly excludes households with incomes under 110 percent of the state poverty level. The state agrees that a household whose income is less than 110 percent of the state poverty level may not be excluded from eligibility, but, it continues, because the phrase "under this subclause" must mean something, see United States v. Blasius, 397 F.2d 203, 207 n. 9 (2d Cir.1968), cert. dismissed, 393 U.S. 1008, 89 S.Ct. 615, 21 L.Ed.2d 557 (1969), the categorical command with respect to these households is limited to the scope of subclause 2(B), which is concerned only with eligibility fixed according to income levels. Thus, the state concludes, the 110 percent limitation relates only to eligibility based on income levels, i.e., Congress established a minimum level respecting only income eligibility below which the states could not go. We agree with the state's construction of the Act.
 
 
 39
 The Act refers to eligibility, not entitlement; it limits the application of the floor to eligibility under subclause (2)(B), and it is entirely reasonable to suppose that Congress put a floor on income eligibility without otherwise restricting the states' flexibility. The statutory language is sufficiently ambiguous so that it can be read to mean either that Congress enacted the income floor without otherwise restricting the states' allocation of funds or that the floor is absolute. Left with two reasonable interpretations of the same subsection, the remainder of the statute and its legislative history must be examined to see if they illuminate the subject further. See Blum, 465 U.S. at 896, 104 S.Ct. at 1547-48.
 
 C. Legislative History
 
 40
 Congress added the 110 percent floor when it amended the Low-Income Energy Act in 1984 to correct some "deficiencies ... noted by the Committee at that time." S.Rep. No. 327, 99th Cong., 2d Sess. 7 (1986), reprinted in 1986 U.S.Code, Cong. & Admin.News 2092, 2098. The floor "restrict[ed] the State's discretion in setting its income eligibility level." S.Rep. No. 484, 98th Cong., 2d Sess. 18 (1984), reprinted in 1984 U.S.Code, Cong. & Admin.News 4847, 4859. Taken alone, this language strongly suggests the Senate was concerned, not with imposing an absolute 110 percent floor, but with setting a minimum with respect to income eligibility. This impression is further borne out by the Senate Report's comment that the restriction was added because "[t]he Committee [was] disturbed by the extremely low percentages of the poverty level chosen by a few States in the past, and [felt] that the limitation in S. 2565 at once preserves the levels set by a great majority of States, while it allows States sufficient flexibility to meet their individual needs." Id. at 4860.
 
 
 41
 At the same time that it added this floor, Congress also added clauses (b)(8) and (b)(5), discussed above. Together, these latter amendments ensure that the states cannot categorically exclude households falling into either the (2)(A) or (2)(B) definitions. The amendments were a reaction to the states' practice of distributing HEAP benefits only to those persons already receiving some form of government assistance--that is, those households described in (2)(A)--simply because doing so made energy fund distribution administratively easy. Id. While the Senate Report's emphatic statements that the amendments would only deny the states the ability to categorically exclude the non-welfare poor and that "the simple designation of a (b)(2) category or categories to be served, or as eligible, does not bind the State to actually give financial assistance to all members of the category," do not directly address the scope of Congress' plan in enacting the 110 percent floor, these statements indicate Congress' purpose in enacting the 1984 amendments was simply to ensure that the program "serve the non-welfare poor" as well as the welfare poor. Id. Congress did not want the states shorn of sufficient flexibility to fulfill the command in the first subclause of clause (b)(5) that the highest level of assistance be furnished to those "households which have the lowest incomes and the highest energy costs in relation to income." Id.
 
 D. HEAP Funds to Those Most in Need
 
 42
 The fact that Congress aimed in the words of the Act to ensure that the states retained flexibility to target benefits to the most needy households, coupled with the legislative history just discussed, is persuasive proof that the 110 percent floor was not meant to be absolute. An absolute floor plainly would deprive the states of the flexibility to target funds to those most in need. Measuring need by which households have the "the lowest income and the highest energy costs in relation to income," 42 U.S.C. § 8624(b)(5), "requires the formulation of policy and the making of rules" and thus is a determination that falls within the purview of the states' interpretive authority. See Chevron, 467 U.S. at 843, 104 S.Ct. at 2782.
 
 
 43
 A state may rationally conclude that tenants occupying government subsidized housing with heat included in the rent are less in need of HEAP funds than, for example, tenants who do not live in such housing. This follows because a tenant living in government subsidized housing with heat part of her rent at least has some of her energy costs already subsidized, and that subsidy is relatively stable in proportion to income because the tenant's rent is not affected by fluctuations in energy costs. See 42 U.S.C. § 1437a(a); 24 C.F.R. §§ 813.107(a), 813.102, 913.102, 913.107; 9 NYCRR § 1627-2.6(c)(5)(i); 18 NYCRR § 352.3(a), (d). In contrast, a tenant not living in government subsidized housing has no cap on the amount of rent payable in proportion to income, and no part of her heating expense has been subsidized. Plaintiffs argue that though heat is included in their government-subsidized rent they nevertheless incur substantial heating costs. The state replies that the rent subsidy makes those costs negligible. Whether plaintiffs incur substantial or negligible heating expenses is a relative question and, in any event, beyond the compass of our inquiry. What is more important--insofar as it reflects on whether the state has rationally exercised the authority delegated to it--is that plaintiffs' heating costs represent a fixed percentage of their income, and are already substantially subsidized. Unlike tenants living in non-government-subsidized-housing, plaintiffs' rent cannot go up in response to a rise in their landlord's heating costs because of the way in which the public assistance and government housing subsidies are structured.
 
 
 44
 This is not to say that tenants must be vulnerable to a rise in heating costs to be eligible for HEAP assistance. Congress eliminated the requirement--extant in an earlier version of the statute--that recipients of HEAP funds be found vulnerable to changes in heating costs. Compare Home Energy Assistance Act, 42 U.S.C. §§ 8601-8612, Pub.L. 96-223, 94 Stat. 288-299, repealed, Pub.L. 97-35, 95 Stat. 902 with Low-Income Home Energy Assistance Act of 1981, 42 U.S.C. §§ 8621 et seq. We merely use plaintiffs' invulnerability to fluctuations in the price of heat as evidence--when coupled with the fact that most, if not all, of their heating costs are actually subsidized--demonstrating the rationality of distinguishing between plaintiffs and other needy tenants who do not reside in government subsidized housing. Specifically, if the income of a household not living in government subsidized housing decreases, its rent and heat costs remain the same, so the percentage of its income paid for heat necessarily increases, even when heat is included in the rent.
 
 
 45
 The picture is different for a household in government subsidized housing whose income decreases. In such case its rent--and thereby its heating costs if included in rent--also decreases, so that the percentage of income the household pays for heat remains the same. See 42 U.S.C. § 1437a(a); 24 C.F.R. §§ 960.209, 813.107(a), 813.102, 913.107; 9 NYCRR § 1627-2.6(c)(5)(i); 18 NYCRR § 352.3(a), (d). The state may therefore rationally determine that tenants of government subsidized housing whose heat is included in their rent do not have "the lowest income and the highest energy costs in relation to income" in comparison with households not occupying such housing. This determination falls within the state's interpretive authority under the Low-Income Energy Act. And since it is not arbitrary, capricious, or manifestly contrary to the statute, we defer to it. See Chevron, 467 U.S. at 844, 104 S.Ct. at 2782; Rural Alaska, 847 F.2d at 539.
 
 
 46
 This rather long digression returns us to the question of whether an absolute 110 percent floor would prevent states from following the direction in the first part of clause (b)(5)--to give aid to those most in need. The foregoing discussion shows it plainly has that potential. Analysis of the legislative history of the 1984 amendments and the policies expressed in the Act leads to the conclusion that the 110 percent floor was aimed at restricting the state's ability to designate a particular income level for purposes of eligibility under clause (2)(B), not its ability to enact other eligibility standards that might indirectly exclude households whose incomes fall under the 110 percent floor.
 
 
 47
 We briefly address one more argument regarding this floor. Plaintiffs reason that because clause (b)(5) prevents the states from discriminating between households that receive public assistance and those that do not, the floor in subclause (2)(B) must also apply to those households identified in subclause (2)(A). This argument is unpersuasive. First, Congress' enactment of the 110 percent floor in subclause (2)(B) demonstrates that when it wanted to put in a floor it knew how to do so, and the absence of a similar provision in subclause (2)(A) means that no income floor applies to households eligible for HEAP funds by virture of receiving other assistance. See Russello v. United States, 464 U.S. 16, 23, 104 S.Ct. 296, 300, 78 L.Ed.2d 17 (1983). Second, the specific language of the floor itself limits its application to "this subclause." To read the floor as applying to all otherwise eligible households would read that limitation out of the statute, something we may not do. See Trichilo v. Secretary of Health & Human Services, 823 F.2d 702, 706, aff'd on reh'g, 832 F.2d 743 (2d Cir.1987).
 
 
 48
 Third, the legislative history summarized above indicates that the 110 percent floor was inserted because it was needed to provide a floor for those persons not on public assistance; the non-discrimination clause was put in, not to protect public assistance households from discrimination in favor of others, but to protect non-public assistance households from discrimination in favor of public assistance households. See S.Rep. No. 484, 98th Cong., 2d Sess. 18-19 (1984), reprinted in 1984 U.S.Code, Cong. & Admin.News 4847, 4860-61. Finally, we believe that if Congress had meant an income floor to be applied to those households whose eligibility is not based on income, it would have said so directly rather than indirectly via a non-discrimination clause. In sum, we therefore hold that 18 NYCRR § 393.4(c)(3)(i) does not violate clauses (b)(2), (b)(5), or (b)(8) of the Act.
 
 III Clause (f)(1)
 
 49
 We next address whether the regulation violates 42 U.S.C. § 8624(f)(1) by allowing the state to consider rent subsidies in determining a household's eligibility, i.e., need for HEAP benefits. In addition to the sections discussed above, the Low-Income Energy Act provides that
 
 
 50
 [n]otwithstanding any other provision of law unless enacted in express limitation of this paragraph, the amount of any home energy assistance payments or allowances provided directly to, or indirectly for the benefit of, an eligible household under this subchapter shall not be considered income or resources of such household (or any member thereof) for any purpose under any Federal or State law, including any law relating to taxation, food stamps, public assistance, or welfare programs.
 
 
 51
 Id. The district court, relying on the Eighth Circuit's opinion in Clifford, held that the state's regulation also indirectly violated this clause because it considered public assistance income in determining HEAP eligibility. While acknowledging that the clause only prevents the opposite calculation--considering HEAP assistance as income for purposes of other public assistance programs, it believed that the Eighth Circuit was correct in ruling that there was "no logical reason why it should be permissible for a state to achieve a net effect contrary to Congress' intent merely by subtracting from one side of an equation instead of the other." 733 F.2d at 538. The question we must answer then, is whether clause (f)(1) prevents states from taking into consideration other public assistance when calculating a household's need for HEAP assistance.
 
 
 52
 Although, we also consider "the purposes Congress sought to serve by promulgating" this clause, our starting point must be the plain language of the statute. The language of f(1) cannot be read as contemplating either that other public assistance may or may not be taken into account in calculating the need for HEAP assistance. Rather, it restricts consideration of benefits provided "under this subchapter" for purposes of other assistance laws. The legislative history of the predecessor statute to the Act reveals Congress' concern was with the use of HEAP funds to offset other public assistance, not the use of other public assistance in calculating the amount of HEAP funds to be given. See Joint Committee Statement, H.R.Conf.Rep. No. 817, 96th Cong., 2d Sess. 154 (1980), reprinted in 1980 U.S.Code, Cong. & Admin.News 642, 705-06 ("The conference agreement requires that fuel assistance payments or allowances provided under this title will not be considered income or resources of an eligible household for any purpose under a Federal or State law"); Dept. of Health & Welfare, State of Idaho v. Block, 784 F.2d 895, 900-01 (9th Cir.1986). To the contrary, in the one instance in which a proposed amendment would have provided that payments made by charitable organizations for energy bills were not to count as income for any federal benefit program, including the Low-Income Energy Act, the amendment was rejected. See S.Rep. No. 484, 98th Cong., 2d Sess. 18 (1984), reprinted in 1984 U.S.Code, Cong. & Admin.News 4847, 4859.
 
 
 53
 The parties dispute whether taking other assistance into account in calculating the need for HEAP payments would further the purposes of the statute. The state claims reading such reciprocity into clause (f)(1) would violate the statutory purpose of providing funds to those households who need them most, because the result would be that public assistance households whose heating costs are already fully or substantially subsidized would receive HEAP benefits, while non-public assistance households with similar incomes who receive no other assistance for heat would receive less HEAP assistance because limited funds would have to be stretched to cover more households.
 
 
 54
 The state contends that this result would be directly contrary to the mandate of clause (b)(5). It points out additionally that if a public assistance household receives subsidies for its heating costs, the HEAP funds will be a windfall used by the household to meet other costs, thereby violating the Act's requirement that HEAP funds be used only to meet energy costs. The reality of this possibility is confirmed by the fact that the very opinion upon which the district court and the plaintiffs rely, Clifford, held that "[t]he general prohibition against using other forms of public assistance to reduce an applicant's entitlement to [the Act's] benefits ... does not prevent the state from assuring that [the Act's] funds are used only to pay a family's heating costs, which heating costs in subsidized homes have already been reduced by the amount of the heating subsidy." 733 F.2d at 540. Yet Clifford failed to explain how it is possible to calculate a household's true need for energy assistance without taking into account the portion that has already been paid.
 
 
 55
 Plaintiffs insist the Act's specific targeting of public assistance recipients for HEAP assistance--though Congress knew that most of these programs already provide some energy assistance--evinces Congress' intent that other aid not be taken into account when calculating the need for HEAP funds. See Clifford, 733 F.2d at 538. We also presume Congress was aware of such other aid, see Cannon v. University of Chicago, 441 U.S. 677, 696-97, 99 S.Ct. 1946, 1957-58, 60 L.Ed.2d 560 (1979), but it may well have intended HEAP to cover only those energy needs not already met by other forms of public assistance. See DeAllaume v. Perales, 701 F.Supp. 49, 52 (S.D.N.Y.1988) (HEAP was meant to supplement, not replace, any public assistance already delivered by state laws).
 
 
 56
 Clause (f)(1) persuasively demonstrates Congress knew how to mandate that certain types of payments not be taken into account when making other calculations. Nothing in the legislative history suggests it desired clause (f)(1) to be read as not counting HEAP funds in calculating income for purposes of other public assistance, but also the use of other public assistance in calculating the need for HEAP funds. No such reciprocal mandate is in the statute. We are compelled therefore to read the language of clause (f)(1) literally and conclude that the New York regulation at issue does not violate this clause.
 
 CONCLUSION
 
 57
 Having concluded that 18 NYCRR § 393.4(c)(3)(i) does not violate any provision of the Act, we reverse and remand this case to the district court for it to rule on the constitutional questions raised by the plaintiffs.
 
 
 
 *
 Hon. Fred I. Parker, United States District Judge for the District of Vermont, sitting by designation