Marie E. WEST, individually and
on behalf of all others
similarly situated

v.

Louis W. SULLIVAN, individually and in his capacity as Secretary of the United States Department of Health and Human Services; Edward R. Madigan, individually and in his capacity as Secretary of the United States Department of Agriculture; Walter W. Cohen, individually and in his capacity as Secretary of the Pennsylvania Department of Public Welfare; and Don Jose Stovall, individually and in his capacity as Executive Director of the Philadelphia County Assistance Office,

Marie E. West, individually and on behalf of the class she represents, Class B, Appellant.

No. 91–1570.

United States Court of Appeals,
Third Circuit.

Argued Feb. 4, 1992.

Decided Aug. 17, 1992.

As Amended Aug. 25, 1992.

Rehearing Denied Sept. 14, 1992.

Peter D. Schneider, George D. Gould, Community Legal Services, Philadelphia, Pa., David A. Super, (argued), Food Research & Action Center, Washington, D.C., for appellant.

Michael M. Baylson, U.S. Atty., Office of U.S. Atty., Philadelphia, Pa., Stuart M. Ger-

son, Asst. Atty. Gen., Anthony J. Steinmeyer, U.S. Dept. of Justice, Civ. Div., Appellate Staff, Constance A. Wynn (argued), U.S. Dept. of Justice, Appellate Section, Washington, D.C., for Appellees Sullivan and Madigan.

Michael L. Harvey (argued), Office of Atty. Gen. of Pa., Dept. of Justice, Harrisburg, Pa., for appellees Cohen and Stovall.

Before: BECKER, ROTH, Circuit Judges, and McCUNE, District Judge.[1]

## OPINION OF THE COURT

ROTH, Circuit Judge.

Appellant Marie West and a class of similarly-situated plaintiffs (collectively West) seek to overturn a district court decision which potentially reduces certain of their benefits under the Food Stamp Act, 7 U.S.C.A. §§ 2011 *et seq.* (1988 & Supp. 1992). Specifically, West challenges a policy adopted by Appellee Edward Madigan, Secretary of the Department of Agriculture (USDA), that would prevent her from factoring a standard deduction for utility costs into her food stamp benefit calculation. Her claim forces us to interpret potentially competing provisions of the Food Stamp Act and the United States Housing Act, 42 U.S.C.A. §§ 1437 *et seq.* (1978 & Supp.1992), encompassing a dizzying array of acronyms and regulations. For the reasons that follow, we will deny West's claim and affirm the order of the district court dismissing her supplemental complaint.

## I.

In August, 1984, West filed a complaint in the Eastern District of Pennsylvania challenging the Secretary of Health and Human Services' (HHS) rejection of her application for social security benefits.[2] While her claim was pending, West amended the complaint to include class action claims under the Food Stamp Act against the Secretary of the USDA and officials of the Pennsylvania Department of Public Welfare (DPW) (collectively USDA).[3] The district court certified two plaintiff classes, only one (Class B) of which is relevant to our disposition of this case. Class B is composed of "all Pennsylvania residents of public housing authority units whose food stamp allotments have been or will be reduced because of the treatment as income of a utility allowance or utility rebate from a public housing authority."[4] In other words, Class B challenged the inclusion in income of certain monthly stipends known as "utility rebates" received from the United States Housing Authority to aid in the payment of energy costs. All Class B members were recipients of utility rebates. The district court granted West's motion for summary judgment on her individual benefit claim and denied the claims of both classes. This court reversed the district court's treatment of Class B, holding that utility rebates are not income for purposes of food stamp calculations. *West v. Bowen*, 879 F.2d 1122 (3d Cir.1989).

1. Honorable Barron P. McCune, United States District Court Judge for the Western District of Pennsylvania, sitting by designation.

2. Appellee Louis Sullivan is the current Secretary of Health and Human Services.

3. The Commonwealth appellees include John White, Jr., Secretary of the Pennsylvania Department of Public Welfare, and Don Jose Stovall, Executive Director of the Philadelphia County Assistance Office.

4. Class A was made up of "all residents of Pennsylvania who have applied or will apply for benefits under Subchapters I, II, X, XIV or XVI of the Social Security Act, [42 U.S.C.A. §§ 301 *et seq.*, 401 *et seq.*, 1201 *et seq.*, 1351 *et seq.*, & 1381 *et seq.*], whose applications have been or will be approved, and who have been or will be eligible for increased retroactive food stamps on the basis of being elderly or disabled persons." Under the Food Stamp Act, the elderly and disabled are subject to less stringent eligibility requirements, and qualify for higher benefits. Class A was certified to address delay in the receipt of food stamp benefits between the filing of the application and the determination that one is "disabled." *See* 7 U.S.C.A. § 2012. West argued that, once an applicant was found to be elderly or disabled, the Food Stamp Act required retroactive payments to the time of application. The district court found that the USDA did not have an obligation to provide payments retroactive to Class A members and granted summary judgment in favor of the USDA. A divided panel of this court affirmed the district court's disposition as to Class A in *West v. Bowen*, 879 F.2d 1122 (3d Cir.1989).

After *West* was decided, the USDA implemented a policy denying Class B members (those receiving utility rebates under the Housing Act) use of a "standard utility allowance" (SUA) in the calculation of their benefits under the Food Stamp Act. On October 9, 1990, West filed a supplemental complaint challenging this policy; the supplemental complaint forms the basis for the present appeal. The USDA moved to dismiss the supplemental complaint on the merits and for lack of standing. West filed a cross-motion for summary judgment. On April 3, 1991, the district court upheld West's standing to challenge the USDA's policy regarding the use of the SUA but dismissed the supplemental complaint on the merits. West's motion for reconsideration was denied, and this appeal followed.

## II.

This case involves two federal statutes, the Food Stamp Act and the United States Housing Act.

### A.

*Food Stamp Act* (7 U.S.C.A. §§ 2011 *et seq.*). The Food Stamp program is administered nationally by the USDA, which must promulgate rules establishing uniform standards of eligibility for food stamp applicants, 7 U.S.C.A. §§ 2014(b), 2013(c) (1988). State agencies such as the Pennsylvania Department of Public Works (DPW) implement the Food Stamp program locally.

Food stamps are available to households meeting specific income requirements. 7 U.S.C.A. §§ 2014, 2015 (1988 & Supp.1992). Household income for food stamp purposes is calculated by subtracting certain household expenditures from total household receipts. Income includes "income from whatever source." 7 U.S.C.A. § 2014(d) (1992). Nonetheless, certain monies guaranteed to be used for non-food expenses may be excluded or deducted from total household receipts. *Id.* For instance, households may "exclude" federal energy

assistance payments from income. 7 U.S.C.A. § 2014(d)(11) (1992). Households may "deduct," *inter alia,* medical and dependent care expenses, as well as so-called "excess shelter expenses." 7 U.S.C.A. § 2014(e) (1988 & Supp.1992).

Calculation of the deductible excess shelter expense is central to this appeal. An excess shelter expense is the amount by which a household's monthly shelter costs exceed half of the household's monthly adjusted income (income after all other deductions have been taken). Monthly shelter costs include rent or mortgage fees, certain property taxes, and utility costs. 7 C.F.R. § 273.9(d)(5) (1992). To ease the determination of total monthly shelter costs, state agencies may authorize substitution of a "standard utility allowance" (SUA) for a household's actual utility costs in certain circumstances. 7 U.S.C.A. § 2014(e) (sentences 5–13). At minimum, to qualify for the SUA, households must "incur heating and cooling costs separately and apart from their rent or mortgage." 7 C.F.R. § 273.9(d)(6)(ii) (1992). In other words, households eligible for the SUA are those directly billed for energy consumption, rather than those which pay for energy costs as part of their rent. Households which do not claim the SUA employ actual utility costs in computing their monthly shelter estimate.[5] 7 U.S.C.A. § 2014(e) (sentence 12). *See* 7 C.F.R. § 273.2(f) (1992). Pennsylvania has established an SUA which eligible households may use in computing utility costs. *See* 55 Pa.Code § 501.7 (1992).

The USDA has encouraged states to set the SUA at a "liberal" level—higher than the average household's utility cost—to foster use of the SUA and thus reduce paperwork for the applicant and the administrating agency. *See* 131 Cong.Rec. 31,-296 (Nov. 12, 1985) (comments of Senator Boschwitz: standard utility allowances "ease administrative complexity," and therefore the "States have set the standard utility allowance somewhat higher than the

---

5. According to West, some households with actual utility costs greater than the SUA might still opt to claim the SUA because the itemization of

actual costs is too cumbersome. West, who suffers from mental disabilities, would place herself in this class.

average utility expenses so they don't have to deal with actual expenses."). *See also* H.R.Conf.Rep. No. 447, 99th Cong., 1st Sess. 526, *reprinted at* 1985 U.S.Code Cong. & Admin.News 1103, 2251, 2452 (SUAs are "designed to encourage efficient administration of the food stamp program").

The size of the SUA has a large impact on food stamp allotments. A "liberal" SUA is likely to increase an applicant's shelter costs, widening the difference between those costs and 50% of adjusted income. This increases the amount of the excess shelter deduction. An increased excess shelter deduction shrinks income and thus augments food stamp benefits.

### B.

*United States Housing Act* (42 U.S.C.A. §§ 1437 *et seq.*). Residents of Public Housing Authority (PHA) buildings pay a fixed "contract" rent of no more than 30% of adjusted gross income. 42 U.S.C.A. § 1437a(a)(1)(A) (1992); 24 C.F.R. § 960.404 (1992). Contract rent includes reasonable utility costs. *See Wright v. Roanoke Redevelopment & Housing Authority*, 479 U.S. 418, 420 & n. 3, 107 S.Ct. 766, 769 & n. 3, 93 L.Ed.2d 781 (1987). Since 1981, utilities consumed by tenants in PHA-owned or leased buildings have been "individually metered," that is, billed to each household apart from the rent.[6] 24 C.F.R. § 965.401. Residents thus pay utility bills directly to the utility provider.

Each month, residents of individually-metered apartments are allotted a public housing utility allowance (PHUA) to be credited toward payment of the contract rent. The PHUA is based on the average reasonable monthly utility cost for households in the area over the course of a year. 24 C.F.R. § 965.470, 475, 476(a). Unlike PHA rent,

the PHUA is not tied to the resident's income.

PHA residents are responsible for payments, which include utility costs, totalling the 30% contract rent figure.[7] The PHUA amount is credited toward the 30% figure, and the resident must pay as "rent" only the difference between the PHUA and the contract rent. Thus, a household with rent of $50 (implying income of $166), and a utility allowance of $30, must pay $20 to the PHA monthly.

In contrast, households with a rent which is less than the PHUA receive a "utility rebate" each month, representing the difference between the household's contract rent and the PHUA. The household is again responsible for mustering the amount of the contract rent, but where the contract rent is less than the PHUA, the household pays no "rent." Thus, a household with rent of $20, and a PHUA of $30, will receive a monthly check for $10—a utility rebate—from the PHA. This check, along with the $20 not paid in rent, is assumed by the USDA to go toward utilities. All Class B members fall into this category, as the class is defined to include only those receiving utility *rebates* (a smaller group than those receiving utility allowances).

Sometimes the utilities bill is higher than the PHUA. Residents must absorb the amount of any utility bill which is above the allowance. By the same token, residents may effectively pocket any amount of the utility allowance conserved *if* the actual bills are less than the PHUA. The PHUA is supposed to encourage efficient use of energy, but for those who live in poorly insulated buildings, the allowance is not always enough. *See West*, 879 F.2d at 1129 n. 8.

Utility rebates generally only go to the poorest of public housing residents, as those with the lowest income are most like-

---

6. Prior to the adoption of 24 C.F.R. § 965.401, some PHA-owned buildings utilized central billing.

7. E.g., "[a]llowances for Tenant-Purchased Utilities represent fixed dollar amounts which are

deducted from the Total Tenant Payment otherwise chargeable to a tenant who pays the actual Utility charges directly to the Utility suppliers, whether they be more or less than the amounts of the Allowances." 24 C.F.R. § 965.470 (1991).

ly to have contract rent below the PHUA.[8] In this case, for example, West stated that her rent is approximately $53 per month (implying income of $177). She receives a PHUA of $152 per month and is therefore mailed a monthly utility rebate of $99 ($152–$53). This amount, together with the $53 for which she is responsible, go toward her utilities costs, which range up to $154 per month. *West,* 879 F.2d at 1130 n. 9.

## C.

*Synthesis of the two acts.* Housing Act payments, as with assistance received under many federal programs for the poor, affect the calculation of benefits under the Food Stamp Act. Until this court's decision in *West v. Bowen, supra,* the USDA considered public housing utility rebates income to the recipient. This resulted in lower food stamp benefits for those receiving the rebates. In *West,* we held that the PHUA utility *rebates* (not the entire utility allowance) were "energy assistance," to be excluded from income under § 2014(d)(11) of the Food Stamp Act.[9] *West,* 879 F.2d at 1132.

This court's designation of rebates as energy assistance had consequences, perhaps unforeseen, for West's ability to claim the SUA under the Food Stamp Act.[10] Prior to *West,* West and her class of PHUA utility rebate recipients were apparently eligible to claim the SUA in calculating monthly food stamp benefits. This is because they were billed separately for utilities, an important component of eligibility for both the SUA and the PHUA. Under the Food Stamp Act, however, eligibility for the SUA is affected by the receipt of energy assistance payments. Households receiving certain kinds of energy assistance are treated differently than those who receive no energy assistance. After this court declared PHUA rebates "energy assistance" instead of "income," the USDA began calculating West's food stamp benefits under a different formula.

Under the new formula, West must not only be separately billed for her utilities, she must also incur "out-of-pocket" costs (a term disputed by the parties) to claim the food stamp SUA in her excess shelter calculation.[11] In imposing the extra out-of-pocket cost requirement, the USDA relies on language contained in the Food Stamp

---

**8.** Again, the PHUA is tied to geographical utility costs, not to income.

**9.** Section 2014(d)(11) exempted from income: any payments or allowances made under (A) *any Federal law for the purpose of providing energy assistance,* or (B) any State or local law for the purpose of providing energy assistance, designated by the State or local legislative body authorizing such payments or allowances as energy assistance[.]
7 U.S.C. § 2014(d)(11) (emphasis added) (this subsection was subsequently amended in 1988).

**10.** It appears that only one other court has followed our lead in designating utility rebates to be excludable "energy assistance." *See Baum v. Yeutter,* 750 F.Supp. 845, 854 (N.D.Ohio 1990). In *Baum,* the district court declared utility rebates excludable income under § 2014(d)(1), which provides that household income includes income from whatever source except "any gain or benefit which is not in the form of money payable directly to a household." *Baum,* 750 F.Supp. at 850. The court reasoned that the utility rebates were not "money payable directly to a household" because the rebates reimburse the recipients for money spent on utilities, rather than providing the household with a flat benefit. *Id.* at 853. The parties in *Baum* did

not raise an argument to exclude the utility rebates under § 2014(d)(11), the provision we relied on in *West.*

Two courts have varied from our holding in *West,* and have held that utility rebates are not excludable income for the purposes of the Food Stamp Act. *See Larry v. Yamauchi,* 753 F.Supp. 784, 799 (E.D.Ark.1990) (district court found that § 2014(d)(11) did not permit exclusion of utility rebates); *Mitchell v. Block,* No. 82–3297–2 (D.S.C. June 22, 1983) (same). The *Mitchell* decision was rendered before our consideration of *West.*

Soon after *West* was decided, the USDA expressed its intention to hold fast to its policy of including energy assistance payments in income for all jurisdictions except the Third Circuit. *See* USDA Policy Memo No. 90–6 (Feb. 9, 1990); App. at 306. The record does not indicate whether this policy was modified for the State of Ohio after the district court's decision in *Baum.*

**11.** If under the USDA's interpretation of § 2014(e), West is not eligible for the SUA because she does not incur out-of-pocket costs, she still remains able to use her actual utility costs in computing her excess shelter expense as a part of her food stamp benefit calculation.

Act, 7 U.S.C.A. § 2014(e), which distinguishes recipients of energy assistance from other food stamp applicants for the purposes of claiming the SUA:

> If a State agency elects to use a standard utility allowance that reflects heating or cooling costs, it shall be made available to households receiving a payment, or on behalf of which a payment is made, under the Low–Income Home Energy Assistance Act of 1981 (42 U.S.C.A. §§ 8621 *et seq.*) *or other similar energy assistance program, provided that the household still incurs out-of-pocket heating or cooling expenses.*

7 U.S.C.A. § 2014(e) (sentence 8) (emphasis added). The Low–Income Home Energy Assistance Act (LIHEAA) is a federal program dedicated to providing heating and cooling assistance to households receiving government support in the form, *inter alia,* of food stamps or aid to families with dependent children; or to households with income near the state poverty level. *See* 42 U.S.C.A. § 8624(b)(2) (1983 & Supp. 1992).

Though the language of § 2014(e) appears to be quite broad, Congress restricted the scope of the provision in 1986, two years after it was adopted, to exempt all LIHEAA recipients from the out-of-pocket cost requirement. *See* 52 Fed.Reg. 5435 (Feb. 23, 1987) (energy expenses covered by LIHEAA are deemed to be "out-of-pocket," whether received directly or through a vendor); Pub.L. No. 99–425, § 504(e), 100 Stat. 975 (1986).[12] The language of § 2014(e) was not altered to effect this change, however; only LIHEAA and the regulations relating to § 2014(e) were amended. Thus, though § 2014(e) includes reference to LIHEAA payments, the out-of-pocket cost requirement now applies only to those households receiving energy assistance under programs "similar" to LIHEAA. The parties contest whether a PHUA rebate is energy assistance "similar" to LIHEAA for the purposes of the out-of-pocket cost requirement.

## III.

West challenges the applicability of the out-of-pocket cost requirement in § 2014(e) to energy assistance payments received directly from the Public Housing Authority in the form of utility rebates. She contests two aspects of § 2014(e): its applicability to households receiving direct, as opposed to vendor or indirect, energy assistance payments such as the PHUA rebate; and, if § 2014(e) applies to direct payments, the definition of "out-of-pocket" costs and the "similarity" of her energy assistance payments to those authorized by LIHEAA. West initially argues that the out-of-pocket requirement in § 2014(e) applies only to recipients of indirect funding—households whose energy assistance is routed directly to the utility vendor. For this argument she relies strongly on the federal regulations adopted to implement § 2014(e). Alternatively, relying on the language of § 2014(e) itself, West argues that PHUA rebates are not "similar" to LIHEAA payments, and therefore that § 2014(e) is not applicable to her. Finally, she posits that, even if § 2014(e) is applicable to her, she has incurred out-of-pocket costs (entitling her to claim the SUA) simply because she is separately billed for her utilities and must pay the bills herself.

The USDA contends, first, that § 2014(e) applies to all recipients of energy assistance not excepted by other statutory provisions; second, that PHUA rebates are nearly identical to LIHEAA payments, thus bringing West and her class within the reach of § 2014(e) and the out-of-pocket cost requirement; and finally that West has not incurred "out-of-pocket" costs, thereby eliminating her eligibility for the SUA, because under the USDA's definition of "out-of-pocket" she must show that her utility expenses exceed her PHUA.[13]

---

12. The USDA was very careful to limit the exemption to LIHEAA recipients, as opposed to all energy assistance recipients. *See* 52 Fed.Reg. 5435 (Feb. 23, 1987).

13. It appears from the figures cited by the parties that West could in fact demonstrate that her actual utility costs were higher than her PHUA, thus entitling her to use of the SUA. Her PHUA is $152, and she indicates that her utility bills sometimes are as high as $154.

Stating that West's class did not have the right to receive utility rebates, only the right not to have those rebates counted as income, the district court upheld the USDA's construction of § 2014(e) and the agency's application of the out-of-pocket cost limitation to West's food stamp calculation. *West v. Sullivan*, No. 84–3883, typescript at 2 (E.D.Pa. Apr. 30, 1991). The court did not address the distinction between direct and indirect energy assistance raised by West.

In this case the district court had federal question jurisdiction under 28 U.S.C.A. §§ 1331 and 1337 (1992), and we have jurisdiction to review the court's final order dismissing the complaint under 28 U.S.C.A. § 1291 (1992). Our review of the dismissal of a complaint for failure to state a claim is plenary. *McArdle v. Tronetti*, 961 F.2d 1083, 1084 n. 1 (3d Cir.1992); *Markowitz v. Northeast Land Co.*, 906 F.2d 100, 103 (3d Cir.1990).

■■ An agency's construction of its statutory mandate is entitled to a certain degree of deference. Under the Supreme Court's *Chevron* test, *see Chevron U.S.A., Inc. v. NRDC*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), courts reviewing agency action confront two questions. The first is whether Congress has spoken directly to the question at issue: "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43, 104 S.Ct. at 2781. Where the statute is silent or ambiguous as to the specific issue, however, "the [second] question for the court is whether the agency's answer is based on a *permissible* construction of the statute." *Id.* (emphasis added). *See NLRB v. New Jersey Bell Tel. Co.*, 936 F.2d 144, 147 (3d Cir.1991) (citing *Chevron*); *FLRA v. U.S. Dept. of Navy*, 966 F.2d 747 (3d Cir.1992) (in banc) (same). In this endeavor we may draw not only on the language of the statute but on the legislative history, the agency regulations adopted to implement the statute, and the agency comments made with respect to the regulations. The agency's interpretation

need not be the only reasonable one. *See Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965). *See also West*, 879 F.2d at 1124.

#### A.

■■ We look first, then, to the plain language of the Food Stamp Act, to see whether Congress has directly addressed the relationship between energy assistance and the SUA. Section 5(e) of the Food Stamp Act, 7 U.S.C.A. § 2014(e), contains fifteen sentences, of which eight relate to the SUA. For context, we include six of the sentences below, broken apart and numbered by sentence (the provisions run back-to-back and unnumbered in the formal text). West challenges the agency's interpretation of sentence 8.

Sentence 5. In computing the excess shelter expense deduction ..., a State agency may use a standard utility allowance in accordance with regulations promulgated by the Secretary ...

Sentence 6. An allowance for a heating or cooling expense may not be used for a household that does *not incur* a heating or cooling expense, as the case may be, or does incur a heating or cooling expense but is located in a public housing unit which has *central* utility meters and charges households, with regard to such expense, only for excess utility costs.

Sentence 7. No such allowance may be used for a household that shares such expense with, and lives with, another individual not participating in the food stamp program, another household participating in the food stamp program, or both, unless the allowance is prorated between the household and the other individual, household, or both.

Sentence 8. If a State agency elects to use a standard utility allowance that reflects heating or cooling costs, it shall be made available to households receiving a payment, or on behalf of which a payment is made, under the Low–Income Home Energy Assistance Act of 1981 (42 U.S.C. 8621 *et seq.*) *or other*

*similar energy assistance program, provided that the household still incurs out-of-pocket heating or cooling expenses.*

Sentence 9. A State agency may use a separate standard utility allowance for households on behalf of which such payment is made, but may not be required to do so.

Sentence 10. A State agency not electing to use a separate allowance; and making a single standard utility allowance available to households incurring heating or cooling expenses (other than households described in the sixth sentence of this subsection) may not be required to reduce such allowance due to the provision (direct or indirect) of assistance under the Low–Income Home Energy Assistance Act of 1981.

7 U.S.C.A. § 2014(e) (emphasis added). It seems clear from the language of sentence 8 that recipients of energy assistance are not eligible to claim the SUA without proof of certain costs, specifically "out-of-pocket heating and cooling expenses." Though sentence 6 does not mention out-of-pocket costs as a condition of SUA eligibility, sentence 6 is directed only to households whose rent includes utilities (excluding West and her class by definition, because they are separately billed), not to those receiving energy assistance payments. Additionally, from the face of sentence 9, households receiving energy assistance may be treated differently from those which do not. Finally, though the drafters of sentence 10 intended to protect households receiving LIHEAA energy assistance from decreased food stamp eligibility, there is no indication that equal treatment under sentence 10 justifies ignoring the out-of-pocket threshold in sentence 8.

Notably, in the sentences related to the SUA, there is no apparent distinction between direct and indirect energy assistance, a difference West urges upon us. In fact, the language of § 2014(e) suggests exactly the opposite: sentence 8 applies to "households receiving a payment, *or* on behalf of which a payment is made." (emphasis added).

In response to the first question under *Chevron,* then, we note that Congress has directly spoken to the general relationship between energy assistance and the SUA. From the face of § 2014(e), proof of out-of-pocket costs is required for all LIHEAA and "similar" energy assistance recipients to claim the SUA under § 2014(e).

### B.

The real issue then becomes whether PHUA rebates qualify as energy assistance "similar" to LIHEAA, and, if the rebates are similar, whether West has incurred "out-of-pocket" costs. The statute is ambiguous as to both of these puzzles, so for guidance we turn to the legislative history of § 2014(e).

Our consideration of the similarity between the PHUA rebate and LIHEAA assistance is clouded by two factors: first, that previous drafts of sentence 8 applied *only* to LIHEAA recipients, and second, that the USDA, in an apparent change of position, has amended the regulations surrounding § 2014(e) to make the out-of-pocket cost requirement apply to everyone *except* LIHEAA recipients.

The out-of-pocket cost requirement in sentence 8, as originally drafted, applied only to LIHEAA recipients. Neither house of Congress included the "or other similar energy assistance program" language in its conference report, though those words were ultimately enacted as part of the 1985 amendments to § 2014(e). The House Report merely proposed that "A State agency may use one or more standard utility allowances for households on behalf of which a payment is made under [LIHEAP] but who also incur out-of-pocket heating or cooling expenses." H.R. 2100, 99th Cong., 1st Sess. 400 (1985). The language in the Senate Report was similar:

If a State agency elects to use a [SUA], the agency shall use a separate allowance for households receiving assistance under [LIHEAP] and a separate allowance for other households or a combined allowance for all such households. In the case of a [SUA] that applies to households receiving such assistance, such al-

lowance shall reflect utility expenses in excess of such expenses paid, directly or indirectly, under [LIHEAA].

S.Rep. No. 145, 99th Cong., 1st Sess. 747 (1985) (amendments as reported out of Senate Agricultural Committee).

Congress specifically rejected a limited role for § 2014(e) and the out-of-pocket cost requirement, however, when it added "other similar energy assistance program[s]" to the language of sentence 8. The "other similar energy assistance" language appears in the Conference Report on H.R. 2100, without accompanying comment; it was subsequently enacted as part of § 2104(e). See H.R.Conf.Rep. No. 447, 99th Cong., 1st Sess. 525 (1985), reprinted in U.S.Code Cong. & Admin.News 2251, 2451; 131 Cong.Rec. H12,314 (Dec. 17, 1985). Thus, on a plain reading of the statute, § 2014(e) was intended to affect a group of which LIHEAA participants were only one part.

The USDA determined, after this court's decision in West, that West's PHUA rebates were energy assistance "similar" to LIHEAA payments for the purposes of § 2014(e). West challenges this determination. She argues that the rebates are not "similar" to LIHEAA because of structural and administrative differences, and thus are excluded from § 2014(e) and the out-of-pocket requirement. This argument is not convincing. Though the programs are administered by different agencies (LIHEAA through the Food Stamp program, PHUA rebates through the Public Housing program), LIHEAA payments are for energy assistance, and, under our decision in West, so too are PHUA rebates. Moreover, this court looked specifically to LIHEAA's legislative history in support of its holding that the PHUA rebate is a form of energy assistance excludable from income under § 2014(d)(11). West, 879 F.2d at 1131.

West notes that, if Congress had meant in sentence 8 to require out-of-pocket costs from all energy assistance recipients, it could have simply used the phrase "energy assistance," as it did in neighboring § 2014(d)(11) (exclusions from income), rather than specifying LIHEAA and "sim-ilar" programs. Though this argument has some force, especially in light of the fact that the original version of sentence 8 applied only to LIHEAA recipients, our job is not to second-guess Congress' turns of phrase, only to review, with deference, the interpretations given to them by the agency. In this case, the agency was faced with statutory language applicable to LIHEAA and "similar" programs; after our decision in West designating PHUA rebates as energy assistance, the agency decided that a PHUA rebate was "similar" to the payments provided under LIHEAA. From the face of the statute and its legislative history, we cannot find this conclusion unreasonable.

Were the question of similarity between PHUA rebates and LIHEAA payments the only interpretive puzzle present in § 2014(e), our review of the agency's construction of the statute would stop at this point. However, Congress amended LIHEAA and the agency amended the regulations surrounding § 2014(e) in 1986, so that all recipients of LIHEAA may now claim the SUA, without proof of out-of-pocket expenses. Congress has thus taken LIHEAA recipients, at whom § 2014(e) was originally aimed, out of the statute. In light of the similarities between LIHEAA payments and PHUA rebates, Congress' removal of a single program's payments from the restrictions of the eighth sentence seems arbitrary and throws into question the relatively strict treatment of other federal assistance such as the PHUA rebate. West might have made a strong policy argument that the PHUA rebates and LIHEAA payments are identical, i.e. both are federal programs providing energy assistance, and thus that the modification permitting LIHEAA recipients to claim the SUA should also apply to recipients of utility rebates.

The USDA determined, however, that the broad reach of § 2014(e) was not affected by Congress' removal of LIHEAA recipients from the out-of-pocket requirement. Specifically, the agency provided that the change to LIHEAA would "not affect current policy with respect to other State or

local energy assistance payments or other expenses paid to a third party on behalf of households." *See* 52 Fed.Reg. 5435 (Feb. 23, 1987). Though this passage fails to mention that the change to LIHEAA would also leave the policy relating to other *federal* payments, such as PHUA rebates, untouched, it is unlikely this specific language was meant to exclude the PHUA from the out-of-pocket cost requirement simply by implication. That Congress amended only LIHEAA rather than the language of § 2014(e) itself, might have been an important factor in the USDA's decision. Thus, as the USDA reads § 2014(e), that section still applies to energy assistance programs similar to LIHEAA, including the PHUA rebate, despite Congress' later exemption of LIHEAA beneficiaries. Though this is certainly not the only conclusion the agency could have reached, we find this interpretation to be permissible.[14]

Finally, West argues that, even if § 2014(e) applies to recipients of PHUA rebates, the agency's definition of "out-of-pocket" costs as "net" costs is impermissible. She contends that "out-of-pocket" means separate billing, that is, that she be required to make the utility payments herself, not that she be required to make a payment above and beyond the amount of her energy assistance. As noted, the statute on its face does not provide any guidance as to the meaning of "out-of-pocket" costs. From the legislative history discussed below, however, we are comfortable with the agency's "common sense" interpretation of the term.

"Out-of-pocket" costs were central to the Congressional debate over the SUA. Members of Congress expressed concern that energy assistance recipients would be able to make use of the SUA without paying any actual utility costs out of their own pockets. As Senator Dole noted "The [Senate Agricultural] committee provisions attempt to establish equity by simultaneously allowing all LIHEAP recipients who have any utility expenses above the value of

LIHEAP assistance the right to claim a standard utility allowance, which may be significantly above their actual expenses." 131 Cong.Rec. 31,298 (Nov. 12, 1985). Later, he reiterated: "Recipients may still claim a standard utility allowance as long as they pay something toward their heating or cooling bills." *Id.* at 31,299. And again: "All we [the Agricultural Committee] did was provide that people should not be eligible for energy expenses unless they incur them, unless they actually pay the money. This is a loophole that should be closed." *Id.* In fact, the Senate Agricultural Committee unsuccessfully proposed changes to the Food Stamp Act that would have limited the amount of the SUA to the average amount applicants incurred over and above their utility assistance payments. *See* S.Rep. No. 145, 99th Cong., 1st Sess. 240 (1985), *reprinted in* U.S.Code Cong. & Admin.News 1676, 1906 (Report for S. 1714, Agricultural Committee Proposal), *rejected in part at* 131 Cong.Rec. 33,044 (Nov. 21, 1985) (Stafford Amendment vote). *See also* 131 Cong.Rec. 31,298 (Nov. 12, 1985) (comments of Sen. Dole regarding the unsuccessful Senate proposal: "standard utility allowances, which reflect average utility expenses instead of using each recipient's actual utility bills, must reflect only actual 'out of pocket' expenses—not any Federal energy assistance payments received by the household."). Though as enacted the SUA is based on a much larger total utility cost figure, the language of the rejected amendment indicates that at least the Senate understood "out-of-pocket" to mean net costs which exceed any utility assistance receipts. Separate billing, West's definition, was not discussed in connection with this definition.

Moreover, long before our decision in *West*, the USDA understood "out-of-pocket" costs to mean net costs. In the regulations adopted to amend the effect of § 2014(e) on LIHEAA recipients, the USDA noted that households no longer

14. West notes, but does not develop, the (strong) policy argument that forcing a household to prove out-of-pocket costs defeats the purpose of a standard deduction. Standard deductions are supposed to eliminate paperwork, and as the Congressional comments illustrate, a SUA under the Food Stamp Act was designed to make administration easier.

must incur out-of-pocket heating or cooling expenses "over and above" their energy assistance payments to be eligible for the SUA. *See* 52 Fed.Reg. 5435 (Feb. 23, 1987). Further, in the wake of *West*, the USDA circulated a memo to administrative agencies in the Commonwealth of Pennsylvania suggesting a re-review of food stamp procedures; consistent with the USDA's reading of § 2014(e), the *then-existing* Food Stamp Handbook required households receiving energy assistance to "incur[ ] costs ... in excess of those reimbursed by energy assistance programs other than LIHEAP" in order to claim the SUA. Food Stamp Handbook, § 560.631. *See West*, 879 F.2d at 1134 (Mansmann, J., concurring) ("We have often found consistency or lack thereof in an agency interpretation to be crucial in determining the degree of deference to be afforded that interpretation"). Finally, the agency's definition appeals to a common sense understanding of "out-of-pocket" costs as money spent but not reimbursed. *Cf.* The Random House Dictionary 1022 (unabr. ed. 1983) ("out-of-pocket" defined, *inter alia,* as "paid out or owed in cash"). We will therefore defer to the agency's interpretation of "out-of-pocket" expenses.

### C.

Despite the seemingly clear language of the statute, and its apparent applicability to West's food stamp benefit calculation, West contends that the federal regulations implementing § 2014(e), and not the statute itself, govern our final analysis of the agency's action. West relies largely on language in 7 C.F.R. § 273.9(d)(6) (1992), which details an applicant's eligibility for a standard utility allowance under the Food Stamp Act. Initially, we note that an agency's interpretation of its regulations is controlling if not "plainly erroneous or inconsistent with the regulations." *Udall,* 380 U.S. at 16–17, 85 S.Ct. at 801 (quotations omitted). Under this standard of review, we are not convinced that the agency erred in its interpretation of the relevant rules.

Section 273.9(d)(6) provides:

(6) *Standard Utility Allowance.* (i) The State agency may elect to offer a [SUA] to households for use in calculating shelter costs. The State agency may establish either:

(A) A separate [SUA] for individual utility expenses defined in paragraph (d)(5)(iii) of this section;

(B) A single [SUA] which includes a heating or cooling component and which is available to *all households which incur out-of-pocket heating or cooling expenses;* or

(C) Two single [SUAs] which include a heating or cooling component.

.    .    .    .    .

(ii) The [SUA] which includes a heating or cooling component shall be made available only to households which incur heating and cooling costs separately and apart from their rent or mortgage. These households *include:*

(A) Residents of rental housing who are billed on a monthly basis by their landlords for actual usage as determined through individual metering;

(B) Recipients of energy assistance payments made under [LIHEAA]; or

(C) Recipients of *indirect* energy assistance payments, made under a program other than [LIHEAA], who continue to incur *out-of-pocket* heating or cooling expenses in accordance with [a section not relevant to this case] during any month covered by the certification period.

7 C.F.R. § 273.9(d)(6) (emphasis added). The regulations relating to the SUA are admittedly murky. West correctly notes that there is no specific mention of households receiving "direct" energy assistance, as she would define the plaintiff class in this case. West infers from the regulatory "omission" of "direct" assistance households in sub-section (d)(6)(ii) that direct and indirect energy assistance recipients are to be treated differently for the purposes of the SUA. This inference is insupportable.

West's attempt to distinguish the two forms of energy assistance is simply a red herring. Notably, to make this argument she must overlook the inclusion of "all"

households, which presumably includes direct assistance households, in the out-of-pocket requirement of sub-section (d)(6)(i). Moreover, the form of energy assistance payment, though historically a basis for separate treatment, is no longer relevant to the excess shelter calculation. The legislative history of the Food Stamp Act makes this evident.

Prior to 1985, recipients of indirect energy assistance could not claim utility costs covered by such payments in the calculation of their shelter expenses. Additionally, households receiving indirect utility assistance could not claim the SUA. *See* H.R.Conf.Rep. No. 447, 99th Cong., 1st Sess. 525, *reprinted in* 1985 U.S.Code Cong. & Admin.News 2251, 2451. During the early 1980's, however, several federal courts struck down the distinction between direct and indirect assistance with regard to the ability to include covered costs in the shelter cost calculation. *See, e.g., Department of Health & Welfare v. Block*, 784 F.2d 895 (9th Cir.1986); *Schmiege v. Secretary of Agriculture*, 693 F.2d 55 (8th Cir. 1982); *Seban v. Block*, 626 F.Supp. 545 (S.D.Ind.1985). In the 1985 amendments to the Food Stamp Act, moreover, Congress

removed the distinction between direct and indirect assistance with regard to the ability to claim the SUA. *See* H.R.Conf.Rep. No. 447, 99th Cong., 1st Sess. 525, *reprinted in* 1985 U.S.Code Cong. & Admin.News 2251, 2451 (adopting the language that was eventually enacted as the eighth sentence of § 2014(e)). Today, all households may include covered utility bills in computing shelter costs, and all households may claim the SUA subject to certain restrictions, including the proof of out-of-pocket costs.[15] Though these changes are not perfectly clear from the face of the regulations,[16] the USDA's construction of the regulations to effectuate Congress' intent to treat direct and indirect energy assistance programs similarly is permissible. We find that the agency's interpretation of the regulations, requiring all energy assistance households to meet the out-of-pocket threshold, is in keeping with the language of § 2014(e), which the regulations were adopted to implement.[17]

## IV.

We note, finally, that our decision to affirm the agency policy challenged here is comparatively narrow: the USDA is simply

---

**15.** West tries to argue that this potential distinction in deductibility is relevant to eligibility for the SUA. Yet, there is a fundamental difference between being able to credit the amounts covered by assistance toward the SUA, which no one contests with regard to West, and requiring a household to prove out-of-pocket costs to claim the SUA. The two concepts are analytically distinct. Thus, the Senate Agricultural Committee proposal, which would have prohibited recipients of both direct and indirect energy assistance from including covered bills, still would have required proof of out-of-pocket costs by all recipients to claim the SUA (and would have limited the SUA to the household's average out-of-pocket cost rather than its average overall utility bill).

**16.** See, for example, the use of the word "indirect" in connection with out-of-pocket costs in sub-section (d)(6)(ii)(C).

**17.** We acknowledge the recurring difficulty of applying the out-of-pocket cost requirement to PHUA rebate households in the face of Congress' more favorable treatment of LIHEAA recipients. As noted on page 185, *supra,* the exception for LIHEAA recipients raises questions about the relatively strict treatment of other

federal energy assistance programs such as the PHUA rebate. Further, we note the extreme inconsistency that might arise where a household receives both the PHUA rebate and LIHEAA assistance: under a literal reading of the LIHEAA amendments, this household need not prove out-of-pocket costs in order to claim the SUA for food stamp benefits, even if the amount of LIHEAA assistance is far less than the PHUA rebate. Despite our frustration with the language of the Food Stamp Act and its regulations, however, courts and agencies cannot second-guess Congress' motive for carving out the LIHEAA program. When and if Congress acts to treat all federal energy assistance programs similarly, our assessment of the agency's construction of the out-of-pocket cost requirement might differ.

We do, however, take this opportunity to urge the responsible officials at the USDA and the Department of Housing and Urban Development to confer and to submit to the Congress an alternative to the incredibly and needlessly complex scheme that we address herein, and/or to attempt to carry out the perceived Congressional intent with a simplified set of regulations. Anyone reading this opinion is bound to conclude that there must be a better way.

construing requirements specifically suggested in the Food Stamp Act. This holding is distinguishable from, for example, the decision by the Court of Appeals for the Second Circuit in *Rodriguez v. Cuomo*, 953 F.2d 33 (2d Cir.1992). In *Rodriguez*, the court held that the State of New York could selectively deny LIHEAA benefits to certain *otherwise-eligible* groups. *Rodriguez*, 953 F.2d at 41–42. The question facing the court was "whether in light of the limited federal funds available may aid be given to those the state deems most in need, even though this results in others also in need not being provided for?" *Id.* at 34. The court answered in the affirmative.[18] Here, we are not deciding whether the agency was correct in choosing among otherwise-eligible applicants for food stamp benefits. As indicated above, the out-of-pocket requirement is firmly dictated by the Food Stamp Act as a threshold for SUA eligibility. Unlike the state policy in *Rodriguez*, proof of out-of-pocket costs was not adopted by the agency as a means to ration inadequate food stamp funds. Rather, our decision addresses only the agency's application of existing requirements, a perhaps unforeseen application triggered by our decision in *West*.

## V.

We will therefore affirm the order of the district court, granting the USDA's motion to dismiss West's supplemental complaint. The USDA's policy requiring recipients of PHUA rebates to prove that they incur out-of-pocket costs in order to claim the food stamp SUA is a permissible construction of potentially competing provisions of the Food Stamp Act and the United States Housing Act.

**18.** Section 8624(b)(2) of LIHEAA requires states to certify that they will make LIHEAA payments only to households with incomes not exceeding 150 percent of the state's poverty level or 60 percent of the state's median income, provided that no household may be excluded from eligibility if the household has an income which is less than 110 percent of the poverty level for such state. 42 U.S.C.A. § 8624(b)(2) (1992). The statute further requires that the state provide the highest level of benefits based to households with the "lowest incomes and the highest energy costs in relation to income." 42 U.S.C.A. § 8624(b)(5) (1992).

After the State of New York's federal funds were sharply cut, the legislature promulgated new regulations implementing the federal LIHEAA program. Tenants of government subsidized housing with heat included in their rent were no longer eligible for LIHEAA funds. Plaintiffs in *Rodriguez* were six residents of government subsidized housing whose eligibility was affected by the new policy. *Rodriguez*, 953 F.2d at 35. They all had income below 110 percent of the New York State poverty level.

The *Rodriguez* plaintiffs argued that under 42 U.S.C.A. § 8624(b)(2), all citizens of New York with incomes less than 110 percent of the poverty level should be guaranteed some LIHEAA assistance. The district court agreed, but the court of appeals did not. The court determined that the guidelines stated in § 8624(b)(2) were not floors beneath which all qualifiers were to receive aid, but rather percentages above which no aid could be given. *Id.* at 36. Thus, households with incomes less than 110 percent of the poverty level "may not be deemed ineligible for HEAP funds solely by virtue of income," though they could be indirectly disqualified on some other "legitimate non-income-based eligibility requirements." *Id.* at 37. Under § 8624(b)(5), high energy costs in relation to income is a legitimate non-income factor. The state concluded that tenants occupying government subsidized housing with heat included in the rent were less in need of HEAP funds than tenants who did not live in such housing—for the former set of tenants, rent was not affected by fluctuations in energy costs. *Id.* at 41. Though the statute did not mandate the exclusion of the group selected by the state, the court found the state's action reasonable in light of Congress' command to consider energy costs in relation to income. *Id.* at 40–41. *But see Clifford v. Janklow*, 733 F.2d 534, 540–41 (8th Cir.1984) (state does not have discretion to single out residents of subsidized housing for different treatment, where LIHEAA provides that benefits be distributed based solely on energy costs in relation to income).