**Debra ESTEY, et al., Plaintiffs, Appellants,**

v.

**COMMISSIONER, MAINE DEPARTMENT OF HUMAN SERVICES, et al., Defendants, Appellees.**

No. 93–1453.

United States Court of Appeals, First Circuit.

Heard Oct. 7, 1993.

Decided April 20, 1994.

Patrick Francis Ende, with whom Pine Tree Legal Assistance, Inc., Augusta, ME, was on brief, for plaintiffs, appellants.

Peter D. Coffman, Washington, DC, with whom Jay P. McCloskey, U.S. Atty., Portland, ME, Frank W. Hunger, Asst. Atty. Gen., Michael Jay Singer and Deborah Ruth Kant, Dept. of Justice, Washington, DC, were on brief, for defendants, appellees.

Before TORRUELLA, Circuit Judge, BOWNES, Senior Circuit Judge, and CYR, Circuit Judge.

BOWNES, Senior Circuit Judge.

Plaintiffs appeal from a judgment on stipulated facts upholding a policy of the United States Department of Agriculture (USDA) that reduces their food stamp benefits. The district court upheld the USDA policy of counting as income for food stamp purposes the utility reimbursements plaintiffs receive from the Department of Housing and Urban Development (HUD) and from the Farmers Home Administration (FmHA). *Estey v. Commissioner, Maine Dep't of Human Servs.*, 814 F.Supp. 152 (D.Me.1993). Because we conclude that the energy-related components of HUD and FmHA utility reimbursements are excluded by statute from income under the Food Stamp Act, we reverse.

## I.

## BACKGROUND

The defendant-appellees are the Secretary of USDA (Secretary) and the Commissioner of the Maine Department of Human Services, the state agency charged with applying USDA's uniform guidelines in administering the food stamp program in Maine. Plaintiffs are a class of tenants receiving food stamps, paying for household utilities, and living in HUD public housing, in privately-owned "Section 8" HUD-assisted apartments, and in privately-owned FmHA-assisted housing.[1]

Plaintiffs, as tenants in HUD and FmHA housing, receive monthly payments, called "utility reimbursements," because all of their utilities are not included in their rent, and because their monthly income is very low relative to average utility costs in their communities. The issue on appeal is whether USDA may count utility reimbursements as income under the Food Stamp Act, 7 U.S.C. §§ 2011–2032, although section 2014(d)(11)(A) of the Act expressly excludes "energy assistance" payments from food stamp income.

### A. Food Stamp Act

The Food Stamp Act establishes a federally-funded, state-administered program to alleviate malnutrition and hunger in low income households by providing needy persons with coupons to purchase food from retail stores. *See id.* § 2011; *Massachusetts v. Lyng*, 893 F.2d 424, 425 (1st Cir.1990); *West v. Bowen*, 879 F.2d 1122, 1124 (3d Cir.1989). USDA establishes uniform standards for food stamp eligibility. *See* 7 U.S.C. § 2014(b). Eligibility depends on income. "Income" is defined as money payable to a household, from whatever source, subject to the exclusions and deductions in the Act. *See id.* § 2014(d)–(e). The exclusion at issue exempts from food stamp income "any pay-

---

1. The class includes
   > [a]ll the persons in the State of Maine who will receive or who have received FmHA and/or HUD utility [reimbursements] anytime since March 1, 1990 and whose food stamp benefits were or will be wrongfully terminated, re- duced, or denied because of the defendant's policy of refusing to exclude FmHA and/or HUD utility [reimbursements] from "income" when determining food stamp eligibility and benefits.

   *Estey,* 814 F.Supp. at 154.

ments or allowances made for the purpose of providing energy assistance under any Federal law." *Id.* § 2014(d)(11)(A). Plaintiffs, as recipients of FmHA and HUD utility reimbursements, are allotted fewer food stamps because USDA interprets the Act to include utility reimbursements as income.

## B. HUD and FmHA Utility Reimbursements

To frame an analysis of whether utility reimbursements are "energy assistance" under the Food Stamp Act, we outline the regulations on utility reimbursements under the FmHA rental assistance program and the HUD section 8 and public housing programs. In relevant respects, these regulations are identical. Tenants in HUD and FmHA housing pay no more than 30% of household income for rent plus an allowance for any utilities not supplied by the landlord. *See* 42 U.S.C. § 1437a(a)(1); 7 C.F.R. pt. 1930, subpt. C, exhs. B.IV.A.2.c, E.II.E. Water, sewerage, trash collection, electricity, cooking fuel, heat, and hot water are utilities for which allowances may be established. *See* 24 C.F.R. §§ 813.102, 965.472, 965.476; 7 C.F.R. pt. 1944, subpt. E, exhs. A–5, A–6. The FmHA utility allowance reflects the utility costs incurred by the majority of households in similar units in a housing complex. *See* 7 C.F.R. pt. 1944, subpt. E, exh. A–6.I, – 6.II. HUD utility allowances represent a "reasonable consumption" of utilities "by an energy-conservative household of modest circumstances consistent with the requirements of a safe, sanitary and healthful living environment." 24 C.F.R. §§ 813.102, 965.476(a).

To prevent tenants who pay for their own utilities from generally incurring excessive utility costs, HUD and FmHA regulations permit rent (capped at 30% of income) to be offset by an allowance for utilities. *See* 24 C.F.R. §§ 813.102, 913.102; 7 C.F.R. pt. 1930, subpt. C, exh. E.IX.A.1. This set off

results in a payment called a "utility reimbursement" whenever monthly income is very low and utility costs are relatively high. A utility reimbursement is equal to the sum of all allowances for any utilities not supplied by the landlord minus 30% of monthly income. *See* 24 C.F.R. §§ 813.102, 913.102; 7 C.F.R. pt. 1930, subpt. C, exh. E.IX.A.2.

For example, if a tenant's monthly income is $100, $30 (30%) is the total amount the tenant must pay for housing costs, including any utility allowance. If the utility allowance is $5, the tenant will not receive a utility reimbursement, but will owe the landlord only $25 because the allowance is credited against the total amount due. A tenant with the same monthly income, but with a utility allowance of $50, will pay the landlord no rent and will receive a utility reimbursement of $20 (the utility allowance minus 30% of $100). Every tenant entitled to a utility reimbursement receives a bill from at least one utility company. The reimbursement ensures that FmHA and HUD tenants, living in very poor households, will not generally pay more than 30% of household income for energy, water, sewerage, and trash collection costs.

## II.

## DISCUSSION

■ Plaintiffs argue that utility reimbursements are "energy assistance," and that section 2014(d)(11)(A) of the Food Stamp Act exempts such assistance from income calculations. USDA contends that this provision, excluding from food stamp income "any payments for the purpose of providing energy assistance," is inapplicable because "energy assistance" is limited to payments made to offset rapidly rising energy costs, whereas utility reimbursements cover routine utility costs.[2]

2. Courts have split over whether USDA may count utility reimbursements as income. *See, e.g., West v. Bowen,* 879 F.2d 1122 (3d Cir.1989) (striking down USDA's policy); *accord South Dakota Dep't of Soc. Servs. v. Madigan,* 824 F.Supp. 1469, 1477 (D.S.D.1993), *appeal docketed,* Nos. 93–2849, 93–2869 (8th Cir. July 21 & 23, 1993); *Carpenter v. North Carolina Dep't of Human Res.,* 107 N.C.App. 278, 419 S.E.2d 582 (1992). *Contra Gore v. Espy,* Nos. 2:91–0139, 2:91–0826,

1993 WL 435566 (S.D.W.V. March 31, 1993); *Scott v. Grunow,* No. 1:90–0188, 1992 WL 611462 (M.D.Tenn. May 22, 1992); *Susan v. Scales,* No. S–91–65M, 1992 WL 672394 (N.D.Ind. May 19, 1992); *Garcia v. Madigan,* No. H–91–1992, 1991 WL 626449 (S.D.Tex. Nov. 29, 1991); *Larry v. Yamauchi,* 753 F.Supp. 784 (E.D.Ark.1990); *Mitchell v. Block,* No. 82–3297–3 (D.S.C. June 22, 1983); *Orr v. Arizona Dep't of*

## A. Standard of Review

A court reviewing an agency's interpretation of a statute it administers must first determine whether Congress has spoken to the "precise question at issue." *Chevron U.S.A. v. Natural Res. Defense Council,* 467 U.S. 837, 842, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984). The precise question in this case is whether "energy assistance" under section 2014(d)(11)(A) encompasses only payments offsetting rapidly rising energy costs. *Cf. id.* at 840, 845, 104 S.Ct. at 2780, 2783 (noting that precise question at issue is whether EPA's plantwide definition of "stationary source" applies to a statute requiring permits for new or modified stationary sources of air pollution). If Congress's intent on this question is clear, "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43, 104 S.Ct. at 2781. Our review of the district court's construction of the statute is *de novo. See Lyng,* 893 F.2d at 428.

In determining congressional intent, we employ the traditional tools of statutory construction, including a consideration of the language, structure, purpose, and history of the statute. *See Dion v. Commissioner, Maine Dep't of Human Servs.,* 933 F.2d 13, 15 (1st Cir.1991). Our inquiry begins with an examination of the relevant statutory language. *American Tobacco Co. v. Patterson,* 456 U.S. 63, 68, 102 S.Ct. 1534, 1537, 71 L.Ed.2d 748 (1982). To be excluded from income under section 2014(d)(11)(A), a payment must be "for the purpose of energy assistance." The Act provides no definition for "energy assistance," but its meaning is generally understood. A payment that provides "assistance" commonly refers to a public subsidy; for example: housing assistance, rental assistance, and medical assistance payments. We assume " 'that the legislative purpose is expressed by the ordinary meaning of the words used.' " *American Tobacco Co.,* 456 U.S. at 68, 102 S.Ct. at 1537 (citation omitted). In the absence of a manifestation of legislative intent to the contrary, we conclude that "energy assistance" means what it says: a public subsidy for the purchase of energy.

Under this plain reading of the provision, the plaintiffs have no colorable claim unless their utility reimbursements are subsidies for energy. FmHA and HUD utility allowances account for nonenergy utilities such as water, sewerage, and trash collection, as well as energy utilities including heat, electricity, natural gas, and hot water. A tenant directly liable for certain utilities receives a utility reimbursement only if the sum of the allowances for these utilities exceeds 30% of household income. Therefore, a utility reimbursement does not subsidize energy purchases unless the tenant pays at least one energy company for the services provided. Otherwise, a utility reimbursement is not an energy subsidy at all because it assists the tenant only in paying nonenergy utility providers.

In response to the Secretary's argument that utility reimbursements can never be energy assistance because they might offset nonenergy utility costs, plaintiffs contend that utility reimbursements are always energy assistance because they are intended "primarily" for the payment of energy bills. A committee report discussing the energy assistance exclusion states that benefits provided by the Home Energy Assistance Act, and the Energy Crisis Intervention and Energy Crisis Assistance Programs, are "energy assistance." *See* H.R.Rep. No. 788, 96th Cong., 2d Sess. 122–23 (1980), *reprinted in* 1980 U.S.C.C.A.N. 843, 955–56. Because these programs historically provided food, medicine, and rental assistance, as well as direct subsidies for fuel bills, plaintiffs contend that Congress did not intend "energy assistance" to include payments only for energy utilities.

Plaintiffs fail to acknowledge the difference between their utility reimbursements and the benefits provided under the programs discussed in the House Report. According to the report, these programs provided assistance to offset the impact of high energy costs. *See id.; see also* 45 C.F.R. §§ 1061.-

*Econ. Sec.,* 158 Ariz. 181, 761 P.2d 1085 (Ariz.Ct. App.1988). *Cf. Maryland Dep't of Human Res. v. USDA,* 976 F.2d 1462 (4th Cir.1992) (upholding

USDA's interpretation of exclusion for energy assistance provided under state or local laws).

51–6(a), 1061.70–8. At issue in this case, however, are utility reimbursements that are designed in part to offset nonenergy utility costs. The analogy suggested by plaintiffs is thus not apt; it does not clarify whether payments designed to account for a mixture of energy and nonenergy expenses are "energy assistance." Neither the energy assistance exclusion's plain language, nor its legislative history evince an intent to exclude payments provided *primarily* for the purpose of energy assistance. For this reason, we decline plaintiffs' invitation to read the word "primarily" or its equivalent into the statute.

The Secretary argues that a utility reimbursement can *never* be a subsidy for the purchase of energy because the allowance may be based exclusively on nonenergy utility costs. In all likelihood, however, part of every tenant's utility reimbursement is based on an energy-related utility allowance. In fact, some tenants receive utility reimbursements only for energy utilities. Named plaintiff Felix St. Peter's utility reimbursement, for example, is a two party check made jointly payable to him and Maine Public Service Company. *See* 24 C.F.R. §§ 813.108, 913.108 (providing that HUD utility reimbursements may be made payable to utility providers). The energy and nonenergy components of a utility allowance are itemized when the allowance is approved by FmHA and HUD; this information may be used to determine what fraction of a utility reimbursement is energy-related. FmHA regulations require a landlord to list each utility allowance separately when seeking FmHA approval for the allowance, and to provide this information to the tenant. 7 C.F.R. pt. 1944, subpt. E, exh. A–6.III to A–6.V. The local public housing agency operating a HUD public housing project must maintain similar lists of utility allowances, and this information is available to the tenant. 24 C.F.R. §§ 965.473, 965.474. Although HUD regulations for section 8 privately-owned housing do not explicitly require that itemized information on utility allowances be retained for the tenant, this is the implication of regulations requiring that HUD or the local public housing agency approve proposed allowances and that allowances be reviewed annually for

adjustments. *See, e.g., id.* §§ 813.102, 882.-116, 882.214. We assume that HUD and the local public housing agency would retain records of utility allowances and would make this information available to the tenant whose rent depends on that allowance.

Such information may be used to determine how much of a utility reimbursement is in fact a subsidy for energy costs. *See South Dakota Dep't of Soc. Servs.,* 824 F.Supp. at 1477 ("computing the energy and non-energy components of [utility reimbursements] would be a simple matter of arithmetic, not a great administrative burden"). If 60% of a utility allowance is attributable to energy costs, then 60% of the utility reimbursement is a payment assisting the purchase of energy. According to a construction of the statute consistent with its plain language, only 40% of the reimbursement may be counted as income under the Food Stamp Act.

### B. Structure of the Act: Deductions and Exclusions

Turning to an analysis of the structure of the Act, we consider whether reading the energy assistance exclusion in context renders counter-intuitive or ambiguous Congress's intent on the meaning of "energy assistance."

The Secretary argues that the structure of the Food Stamp Act indicates that utility reimbursements are not "energy assistance." Income eligibility determinations for food stamps resemble income tax calculations, *see Department of Health & Welfare v. Block,* 784 F.2d 895, 900 (9th Cir.1986); that is, net food stamp income equals gross income, minus any payments that are excluded by statute, minus the standard deduction and any other deductions applicable to the household. The Food Stamp Act's "standard deduction" and "excess shelter cost deduction" account for utility costs. *See* 7 U.S.C. § 2014(e). According to the Secretary, excluding utility reimbursements as "energy assistance" would subtract utility costs twice: once as an exclusion and again as a deduction.

The argument that a payment may not be excluded because it offsets a cost already accounted for by the standard deduction is

not persuasive. All households, regardless of size, receive the standard deduction, which only in the most general sense reflects energy utility costs, just as it reflects many other costs. The standard deduction is a fixed sum that is adjusted annually according to the Consumer Price Index "for items other than food and the homeowners' costs and maintenance and repair component of shelter costs." 7 U.S.C. § 2014(e).

The deduction for excess shelter costs specifically accounts for energy utilities, but it does not capture the entire cost of energy utilities. The statute allows a household to deduct shelter expenses, including rent and utilities, only "to the extent that the monthly amount expended by [the] household for shelter" exceeds 50% of the household's income after all other deductions have been taken. *Id.* Deductible expenses include rent, property taxes, property insurance, and mortgage payments and interest, as well as fuel, electricity, water, sewerage, trash collection, and telephone service. *See* 7 C.F.R. § 273.9(d)(5)(ii). The cap on the deduction is adjusted to reflect changes in the Consumer Price Index for the shelter, fuel, and utilities components of housing costs. 7 U.S.C. § 2014(e).

According to the Secretary, Congress could not have intended to exclude the energy component of utility reimbursements, given the existence of the excess shelter cost deduction. But the Secretary does not offer an alternative construction of the Act that absolutely precludes deducting energy utility costs whenever energy assistance payments are excluded from income. Even if the energy assistance exclusion were intended to cover only payments offsetting rising energy costs, as USDA contends, any payments designed to offset rising energy costs would be

excluded, while the energy costs themselves would be deductible. Implicit in any construction of the energy assistance exclusion is that Congress intended energy assistance to be excluded and energy utility costs to be deducted, to the extent that all shelter costs exceed 50% of monthly income. This is borne out in the legislative history of the energy assistance exclusion: "If a household receives an energy allowance or grant, that allowance or grant is not to be included in income at all, but the energy costs which it covers may continue to be treated as a potentially deductible shelter expense when billed or due." H.R.Rep. No. 788, *supra,* at 123, 1980 U.S.C.C.A.N. at 956.

As a practical matter, there is unlikely to be a substantial overlap between households excluding the energy component of utility reimbursements and those deducting excess shelter costs. Tenants receiving utility reimbursements pay no rent and incur no homeowners' expenses. They are entitled to the excess shelter cost deduction only to the extent that their utility costs *alone* exceed half of their monthly income, including the nonenergy component of their utility reimbursements.[3] In other words, the poorest food stamp recipients living in public housing would exclude the energy component of their utility reimbursements, then deduct the fraction of their utility bills exceeding half of their income. This result is consistent with the Act's purpose to alleviate hunger and malnutrition by augmenting the food purchasing power of participating low-income households. *See* 7 U.S.C. § 2011. We do not find that the structure of the Food Stamp Act requires that the energy assistance provision be construed contrary to its plain language. Our reading of the provision in con-

---

**3.** For administrative convenience in calculating the excess shelter expense deduction, a "standard utility allowance" (SUA) may be used in lieu of a household's actual utility costs. 7 C.F.R. § 273.9(d)(6). Households receiving "energy assistance" may use the SUA only if they incur "out-of-pocket" heating or cooling expenses. 7 U.S.C. § 2014(e). The Third Circuit, having previously found impermissible the USDA policy of counting utility reimbursements as income, *see West,* 879 F.2d at 1132, subsequently upheld a USDA policy preventing recipients of utility reimbursements from using the SUA unless their actual utility costs exceeded their public housing utility allowances, *see West v. Sullivan,* 973 F.2d 179 (3d Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 2934, 124 L.Ed.2d 684 (1993). Plaintiffs argue that they may use the SUA, even if their utility reimbursements are energy assistance, because they must pay 30% of household income for utilities. We do not address this argument because it is not an issue in this case.

text reinforces our determination that the plain language manifests Congress's intent.

### C. Legislative History

We next consider the legislative history of the energy assistance exclusion, to determine whether the legislative intent we find clearly expressed in the statutory language is clouded or contradicted by any statements of members of Congress.[4] When the exclusion was enacted in 1980, the House Committee on Agriculture issued a report noting that certain energy grants and allowances, designed to offset the rising cost of energy, had been excluded from food stamp income calculations in prior years by express provisions in other statutes. H.R.Rep. No. 788, *supra*, at 122, 1980 U.S.C.C.A.N. at 955. The report cites examples of energy assistance programs that were designed to offset the rise in energy costs in the late 1970s and in 1980, *id.* at 121–22, 1980 U.S.C.C.A.N. at 954–55, and notes that the exclusions for assistance provided under these programs ensured that food stamp recipients would be held "harmless" for their benefits. *Id.* at 122, 1980 U.S.C.C.A.N. at 955.

Preferring that amendments to the Food Stamp Act be made under its aegis, the committee drafted the energy assistance exclusion, which "incorporate[s] the essence" of these prior exclusions. *Id.* The committee stated that the provision would exclude "all energy assistance provided households through the use of Federal, State, or local funds flowing from ... laws that focus on the problem of energy assistance." *Id.* at 123, 1980 U.S.C.C.A.N. at 956. The committee further stated that the provision would "exclude from income any direct payments made to households by the Federal Government" under "crisis intervention" or "regular energy assistance" programs. *Id.* This aspect of the committee report does not define "energy assistance," but does indicate that section 2014(d)(11), by incorporating the essence of similar, program-specific provisions in other statutes, was intended to exclude "any" pay-

ments providing energy assistance under "any" federal law.

The committee report further states:
*Where energy assistance provided households through the use ... of Federal, State, or local funds flowing from Federal, State, or local laws not specifically dealing with energy assistance is concerned, such as Aid to Families with Dependent Children or General Assistance, the Committee also intends to guarantee excludability provided that [USDA] is satisfied that the increase in benefits awarded by the State or local government (either on a matching basis with the Federal Government or on its own) is, in fact, an energy assistance-related increase and not simply a general welfare increase that would have occurred even were energy costs not a factor and that, therefore, should be viewed as income for food stamp program purposes. Only where energy costs are a but-for cause of the increased payment should the payment be excluded from income and, then, only to the extent that the increase is attributable to high heating costs rather than general inflationary conditions. The Committee obviously expects that State legislatures and local councils will ... not take advantage of this exclusion by labeling every ... regular welfare allotment adjustment an energy assistance increase in order to take advantage of this exclusion....*

*Id.* (emphasis added).

The Secretary argues that the highlighted statements support a narrow definition of "energy assistance" for the purpose of section 2014(d)(11)(A). Our scrutiny of the context, however, leads us to conclude that these remarks were prompted by the concern that state and local governments might pass off increases in existing, nonenergy-related welfare program payments as "energy assistance." *See Maryland Dep't of Human Res.*, 976 F.2d at 1470–71. Because the federal government pays the entire cost of food stamp benefits, 7 U.S.C. § 2013(a), such a

---

4. We reject the parties' invitation to delve into the language and legislative history of the Housing and Community Development Act of 1992, Pub.L. No. 102–550, § 927, 106 Stat. 3672, 3885–86 (1992). That statute addresses neither how utility reimbursements should be treated under the Food Stamp Act, nor the proper interpretation of the energy assistance exclusion.

ploy would increase the allotments of food stamps to a state's residents at no substantial cost to the state. To thwart such efforts, Congress subsequently amended the exclusion for energy assistance payments provided under state and local laws.[5] *See Maryland Dep't of Human Res.*, 976 F.2d at 1471. Utility reimbursements, in contrast, are provided under federal regulations that specify that the payments account for energy and nonenergy utility costs. Although we do not dispute that the committee intended that "energy assistance" include benefits offsetting the rising cost of energy, the legislative history of the provision reveals no intent to circumscribe the plain language of the provision so that it would apply only to such benefits.

Furthermore, we note that the Secretary's interpretation of the energy assistance exclusion causes a result at odds with the legislative history. The 1980 House Report indicates that typical energy assistance programs "hold low-income households harmless by permitting them to buy the same amount of energy they would have utilized in past years without having to diminish their already marginal incomes." H.R.Rep. No. 788, *supra*, at 122, 1980 U.S.C.C.A.N. at 955. An exclusion for such assistance, according to the House Report, guarantees that low-income households are held harmless for the assistance they receive. *Id.* Utility reimbursements with energy components are designed in part to ensure that tenants, on average, will be able to purchase energy utilities without spending more than 30% of household income. The allowances underlying these reimbursements are adjusted annually to reflect substantial energy cost increases. *See, e.g.,* 7 C.F.R. pt. 1930, subpt. C, exh. E.IX.C; 24 C.F.R. §§ 882.214, 965.478. In this manner, utility reimbursements ensure that a household's expenditures for energy

remain constant as a percentage of household income, from year to year. USDA's practice of counting the energy component of utility reimbursements as income does not hold tenants "harmless" for the assistance they receive.

The Secretary argues that Congress ratified USDA's interpretation of the statute when it amended the energy assistance exclusion in 1988. Prior to 1988, section 2014(d)(11)(A) exempted from income "any payments or allowances made under any Federal law for the purpose of providing energy assistance." *See West v. Bowen*, 879 F.2d at 1130. Congress reworded the statute in 1988 so that the provision currently excludes "any payments or allowances for the purpose of providing energy assistance under any Federal law." A Senate committee report indicates that this "technical amendment" clarified

> that USDA and local agencies do not need to conduct an inquiry into the purpose of a federal statute before excluding federal "payments for the purpose of energy assistance." The law as now written could be read to require this analysis.
>
> The crucial question should be whether the purpose of the payment is energy assistance, not whether the statute, as a whole, is primarily for energy assistance or includes other human services as well. *This change is not intended to change current policy.*

S.Rep. No. 397, 100th Cong., 2d Sess. 28–29, *reprinted in* 1988 U.S.C.C.A.N. 2239, 2266–67 (emphasis added).

The Secretary urges us to read the last sentence in the quoted text as endorsing the *agency's* policy of restricting the definition of energy assistance solely to payments offsetting dramatic increases in the cost of energy. The problem with the Secretary's argument

---

**5.** Section 2014(d)(11)(B) excludes from food stamp income,

> any payments or allowances made for the purpose of providing energy assistance ... under any State or local laws designated by the State or local legislative body authorizing such payments or allowances as energy assistance, and determined by the Secretary to be calculated as if provided by the State or local government involved on a seasonal basis for an aggregate

period not to exceed six months in any year even if such payments or allowances (including tax credits) are not provided on a seasonal basis because it would be administratively infeasible or impracticable to do so.

Unlike the exclusion for federal energy assistance, this statute expressly provides the Secretary a role in determining whether payments designated by state or local governments as "energy assistance" should be counted as income.

is that USDA's policy of applying the exclusion only to payments offsetting dramatic increases in the cost of energy did not exist at the time the Senate Report was drafted. Although USDA treated utility reimbursements as income before 1988, the agency based this practice on the faulty interpretation of the energy assistance exclusion that the 1988 amendment was designed to correct. The two cases construing the statute prior to 1988, *West v. Bowen,* No. 84–3883, 1987 WL 28346 (E.D.Pa. Dec. 17, 1987), *rev'd,* 879 F.2d 1122 (3d Cir.1989) and *Mitchell v. Block,* No. 82–3297–3, slip op. at 10 (D.S.C. June 22, 1983), held, consistent with USDA's interpretation at that time, that utility reimbursements are not "energy assistance" because they were authorized by federal *housing* laws, rather than *energy assistance* laws.[6]

Viewed in this light, the plaintiffs' interpretation of the 1988 amendment and the Senate Report is more persuasive: the amendment was not intended to change *congressional* policy, but in effect it repudiated the agency's litigation position by clarifying that *any* payments for energy assistance be excluded, regardless of the purpose of the law authorizing the payments. Further support for this interpretation is that the committee described the rewording of the statute as a "technical amendment." The statement in the legislative history that the amendment "is not intended to change current policy" reaffirms that it is not a substantive revision of the statutory language.

The Secretary's final argument based on the legislative history is that Congress expressed tacit approval of USDA's interpretation by leaving it in place when it amended the statute in 1988. Inaction may signify acquiescence to an agency interpretation. *See, e.g., Bob Jones Univ. v. United States,* 461 U.S. 574, 600–01, 103 S.Ct. 2017, 2032–33, 76 L.Ed.2d 157 (1983). A logical prerequisite to inferring approval or ratification from silence is that the agency's interpretation antedates any relevant amendments. That is not so here. Although USDA has invariably deemed utility reimbursements to be income

under the Food Stamp Act, the agency's rationale for this practice has changed over time. Prior to the 1988 amendment of the Act, the agency asserted in litigation that the exclusion applied only to payments made under federal laws specifically enacted to provide energy assistance. The 1988 amendment condemned this interpretation, *see West v. Bowen,* 879 F.2d at 1322, and the agency abandoned it in favor of the position it espouses in this case, that "energy assistance" refers only to payments offsetting rapidly rising energy costs. The interpretation of the statute at issue on appeal thus does not predate the 1988 amendment.

We have considered USDA's unvarying *treatment* of utility reimbursements as an "interpretation" of the statute capable of ratification by silence, but we do not find great significance in Congress's inaction. "Congressional inaction frequently betokens unawareness, preoccupation, or paralysis." *Zuber v. Allen,* 396 U.S. 168, 185–86 n. 21, 90 S.Ct. 314, 323–324 n. 21, 24 L.Ed.2d 345 (1969). Legislative silence is most significant when the "area is one of traditional year-by-year supervision, like tax, where watchdog committees are considering and revising the statutory scheme." *Id.* In the baker's dozen years that have passed since the Food Stamp Act energy assistance exclusion was enacted, the Act has been amended many times, but the exclusion itself has been amended only twice. The 1981 amendment affected only the provision excluding state and local energy assistance payments. The legislative history of the 1988 amendment reflects a senate committee's appreciation that USDA misread the statute, but does not indicate the committee's awareness of USDA's treatment of utility reimbursements. *See* S.Rep. No. 397, *supra,* at 28, 1988 U.S.C.C.A.N. at 2266 (stating that "USDA and local agencies do not need to conduct an inquiry into the purpose of a federal statute before excluding" energy assistance). Therefore, even if what the senate committee recognized about the agency's prior misreading of the statute were attributable to the entire Congress, this would not prove con-

---

**6.** The district court in *Mitchell* cited the legislative history of the energy assistance exclusion as an alternate basis for upholding the practice of

counting utility reimbursements as income. *See Mitchell,* No. 82–3297–3, slip op. at 13–28.

gressional cognizance of the treatment of utility reimbursements.

There are still fewer facts outside the legislative history supporting an inference of congressional awareness. USDA has not embodied its interpretation of the federal energy assistance exclusion in a regulation. Moreover, our research uncovered nothing suggesting that the agency embodied its position on utility reimbursements in any agency publication prior to 1990, when it issued policy statements on the matter. And the only courts considering USDA's treatment of utility reimbursements prior to 1988 issued unpublished opinions. *E.g., West*, No. 84–3883, 1987 WL 28346; *Mitchell*, No. 82–3297–3. Furthermore, the policy of including utility reimbursements in food stamp income affects only very poor FmHA and HUD tenants, persons unlikely to have the resources to publicize their plight. We cannot infer from the legislative history and from these facts that congressional silence signals ratification of the agency's policy. Nor do we find in the legislative history any statements belying our determination that Congress's intended meaning for the energy assistance exclusion is manifested by its plain language.

### D. Deference

■ The Secretary argues that we must defer to the agency's judgment on the applicability of the energy assistance exclusion to utility reimbursements because this authority has been expressly delegated to the agency. According to the Secretary, Congress explicitly called on USDA to determine whether any payments provided under federal "laws not specifically dealing with energy assistance" were "energy-assistance related." H.R.Rep. No. 788, *supra*, at 123, 1980 U.S.C.C.A.N. at 956. An agency's reasonable construction of a statute is entitled to deference when Congress delegates to the agency the power to interpret the statute. *See St. Luke's Hosp. v. Secretary of Health & Human Servs.*, 810 F.2d 325, 331 (1st Cir. 1987).

We previously quoted the passage from the House Report cited by the Secretary in support of this argument, *see* H.R.Rep. No. 788, *supra*, at 123, 1980 U.S.C.C.A.N. at 956,

and we noted that the remarks reflected the committee's concern that state or local governments might pass off increases in general welfare as energy assistance. Utility reimbursements, in contrast, are authorized by federal regulations specifying that the payments account for energy utility costs. The legislative history cited by the Secretary does not empower USDA to refine the energy assistance exclusion so that it does not apply to the energy component of a utility reimbursement.

■ Finally, the Secretary contends that USDA's policy should be upheld because, under *Chevron*, courts must defer to an agency's reasonable interpretation of a statute it administers. *Chevron* prescribes that courts employ a two-step analysis of an agency's interpretation of a statute it administers. *See Dion*, 933 F.2d at 14–15. Deference is appropriate only when the legislative intent is unclear. *See St. Luke's Hosp.*, 810 F.2d at 331. In this case, the plain language of the statute manifests Congress's intent on the question at issue: any payment designed to offset energy costs is excluded from food stamp income, not just payments offsetting rapidly rising energy costs. We conclude that the energy component of a HUD or FmHA utility reimbursement, as a subsidy for the purchase of energy, must be excluded from food stamp income calculations. Any policy of USDA to the contrary is impermissible.

The decision of the district court is therefore

*Reversed.*

Dissent follows.

CYR, Circuit Judge (dissenting).

Although the court proposes a plausible alternative, I cannot agree that the Exclusion 11 interpretation adopted by the United States Department of Agriculture ("USDA") is "arbitrary, capricious, or manifestly contrary to the statute." *Chevron U.S.A., Inc. v. National Resource Defense Council*, 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984). Not only are statutory interpretations by an administering agency entitled to deferential review, *id.*, but the

rationale underlying the *Chevron* doctrine is fully implicated in this case. I would therefore accord *Chevron* deference to USDA's interpretation of the pivotal language "energy assistance [payments]," as excluding ordinary utility reimbursements ("URs").

First, the omnibus regulatory scheme established under the Food Stamp Act ("FSA") is "technical and complex" both in its literal statutory manifestation and in its interdependent implementation with several elaborate federal and state public assistance statutes administered by other agencies (*e.g.,* HUD and FmHA). *See id.* at 865, 104 S.Ct. at 2792; *Maryland Dep't of Human Resources v. United States Dep't of Agric.,* 976 F.2d 1462, 1470 (4th Cir.1992). As a consequence of its accustomed immersion in the intricacies of the FSA, and its intimate familiarity with related statutory schemes, the USDA, like other administering agencies, ordinarily is presumed to have the confidence of Congress in affording interstitial interpretations of statutes entrusted to its administration. *See Chevron,* 467 U.S. at 865, 104 S.Ct. at 2792 ("Judges are not experts in the field...."); *Sierra Club v. Larson,* 2 F.3d 462, 468–69 (1st Cir.1993); *Aronson v. IRS,* 973 F.2d 962, 965 (1st Cir.1992); *Evans v. Commissioner of Maine Dep't of Human Servs.,* 933 F.2d 1, 7 (1st Cir.1991). Further, as a politically accountable executive agency, generally speaking the USDA should be left to "strike the [policy] balance" not struck by Congress, and to reach "a reasonable accommodation of manifestly *competing* interests." *Chevron,* 467 U.S. at 865–66, 104 S.Ct. at 2792 (emphasis added). The policy *choices* plainly implicated by the FSA's provisions on income inclusion and exclusion, and Congress's repeated failure to countermand USDA's longstanding policy favoring inclusion of URs, *see Zemel v. Rusk,* 381 U.S. 1, 12, 85 S.Ct. 1271, 1278, 14 L.Ed.2d 179 (1965), present a textbook case for *Chevron* deference. Lastly, ever since 1980, after considering Exclusion 11 and its legislative history "in a detailed and reasoned fashion," *Chevron,* 467 U.S. at 865, 104 S.Ct. at 2792, the USDA consistently has concluded that Congress did not intend to insulate food stamp recipients from energy cost increases that routinely accompany inflationary rises in the nature of "normal household living expenses." 7 C.F.R. § 273.9(c)(5) (1993).

I readily acknowledge, of course, that *Chevron* does not dictate judicial deference to agency interpretations in all circumstances. *See, e.g., Larson,* 2 F.3d at 468 (under *Chevron,* "courts have the last word on statutory interpretation [and] the question is one of *how much weight* to be accorded to agency views") (emphasis added). In my view, however, after charting the course for its two-tiered *Chevron* inquiry, the court misplaces its compass by withholding deference on impermissible grounds.

The overarching aim of the *Chevron* analysis is to determine "whether Congress has directly spoken to the *precise question* at issue." *Chevron,* 467 U.S. at 842, 104 S.Ct. at 2782 (emphasis added); *see K Mart Corp. v. Cartier, Inc.,* 486 U.S. 281, 291–92, 108 S.Ct. 1811, 1817–18, 100 L.Ed.2d 313 (1988) ("[A] reviewing court must *first* determine if the regulation is *consistent* with the language of the statute ... [or] [i]f the statute is silent or ambiguous with respect to the *specific issue addressed by the regulation....*") (emphasis added). In the present case, the court frames the inquiry less precisely than *Chevron* requires. *See supra* p. 1201 (the issue is "whether 'energy assistance' under [Exclusion 11] encompasses only payments offsetting rapidly rising energy costs"). Under the *Chevron* framework, the "precise question," *Chevron,* 467 U.S. at 842, 104 S.Ct. at 2781, thus the controlling one, is much more narrowly focused: Has Congress expressed a "specific intention" to include or exclude HUD and FmHA URs from the ambit of the phrase "payment[s] ... for energy assistance"? *Cf. id.* at 845, 104 S.Ct. at 2783 (inquiring whether Congress evinced its "specific intention" to apply EPA's proposed "bubble concept" to the statutory term "stationary [air pollution] source").

### Language, Structure, and Purposes of the FSA and Exclusion 11

If the undefined term "energy assistance [payment]" has a plain and determinate meaning under the FSA, as the court suggests, *see supra* p. 1201 ("a[ny] public subsidy for the purchase of energy"); *but cf. Dion*

*v. Commissioner of Maine Dep't of Human Resources*, 933 F.2d 13, 15–16 (1st Cir.1991) (rejecting USDA interpretation of "child," based on FSA's variant uses of *same* term), then the initial prong under the *Chevron* inquiry is met, and the USDA cannot prevail no matter how plausible its interpretation. *See Public Employees Retirement Syst. v. Betts*, 492 U.S. 158, 171, 109 S.Ct. 2854, 2863, 106 L.Ed.2d 134 (1989). However, the USDA does not disagree that the term "energy assistance [payment]," viewed in isolation, is susceptible to more expansive interpretation. Rather, it contends that the statutory and historical contexts of Exclusion 11 support the narrower construction given it by the agency. *See Skidgel v. Maine Dep't of Human Servs.*, 994 F.2d 930, 937 (1st Cir. 1993) ("plainness" of legislative language must be considered in the context of the *entire* statute and its *policy* goals); *see also National R.R. Passenger Corp. v. Boston & Maine Corp.*, —— U.S. ——, ——, 112 S.Ct. 1394, 1401, 118 L.Ed.2d 52 (1992) (same). Thus, at least three related impediments must be overcome before the term "energy assistance [payment]" can be considered sufficiently "plain" to warrant withholding *Chevron* deference in this case.

First, at the same time it explicitly added *"income" exclusions* to the FSA in 1977, Congress clearly evidenced its intention that the statute's *"broad-gauged* definition of income ... measure *income as broadly as possible* to be *fair* to all [FSA] recipients as well as to the *tax-paying public* and not simply by reference to purchasing power available for food." H.R.Rep. No. 464, 95th

Cong., 1st Sess. 27 (1977), *reprinted in* 1977 U.S.C.C.A.N. 1704, 1978, 2004; *see* 7 U.S.C. § 2014(d) ("Household income for purposes of the [FSA] shall include all income *from whatever source excluding only ....*") (emphasis added). Given this historical context, it would seem appropriate to recognize that the FSA's broadly gauged "income" inclusion provision strongly suggests that exclusions from "income" under the FSA are to be strictly limited, lending considerable rational force to the USDA's limiting interpretation of the Exclusion 11 term "energy assistance [payments]." *Cf., e.g., Commissioner v. Jacobson*, 336 U.S. 28, 49, 69 S.Ct. 358, 369, 93 L.Ed. 477 (1949) (Internal Revenue Code's deliberately broad definition of taxable "income" necessitates limiting interpretation relating to exemptions).

Second, the court concedes that the *entire* phrase "energy assistance [payments]"—not merely its discrete component "energy assistance"—is *ambiguous* in one important and unmistakable respect; *viz.*, viewed as a *unitary* federal assistance payment, the average HUD or FmHA UR—unlike, for example, a payment made pursuant to the Low Income Home Energy Assistance Act, *see supra* pp. 1201–02—obviously is *not purely* a "payment[ ] or allowance[ ] made for the purpose of providing energy assistance," but often includes various nonenergy components (*e.g.*, water charges, trash collection charges). The court proposes to avoid the looming interpretive dilemma in its path by requiring the agency to segregate these nonenergy UR components from the energy component. *See supra* p. 1202.[7] As the district court

---

7. Given the FSA's complex structure, and the internal cross-references in Exclusion 11 to other federal and state statutes of comparable complexity, it is difficult to accept the facile conclusion that segregation of the energy component from the nonenergy components in URs would pose no significant administrative burden. The USDA vigorously insists otherwise, and the district court prudently bypassed the entire administrative implementation issue. *See Estey*, 814 F.Supp. at 158 n. 2. On the other hand, this court bases its "minimal administrative burden" thesis solely on an examination of the cold appellate record, including the FSA, HUD, and FmHA implementing regulations, without the benefit of a developed record relating to the types of problems which might portend serious administrative burdens.

The USDA does not set, monitor, or control HUD or FmHA utility allowances, nor the annual *adjustments* to those allowances. Thus, even though segregation may appear a "simple matter of arithmetic" in the abstract, it cannot simply be assumed that segregation would not entail elaborate interagency monitoring and policing—for example, between the USDA and HUD to ensure that food stamp recipients correctly declare the appropriate components of their URs as excludible income. Absent some contrary evidence, therefore, the USDA's assessment of the likely burdens entailed in implementing such an administrative regime warrants prima facie deference.

aptly noted, however, the entire phrase *"payments ... made for the purpose of energy assistance"* suffers from a latent ambiguity and raises a serious question as to whether the 96th Congress ever considered the possibility that Exclusion 11 might be interpreted to include discrete *portions* of "mixed" or multi-purpose *utility* payments like HUD and FmHA URs.·

Finally, the conclusion that the USDA interpretation is at odds with the legislative policy underlying the FSA does not withstand scrutiny. Recipients of HUD and FmHA URs can lay claim to no *special* burden under the food stamp scheme. Congress itself has recognized the·principle of "fairness" which underlies the FSA's narrowly-drawn income exclusions, and the competing interests at stake in any benefit allocation made by government. *See* H.R.Rep. No. 464, *supra*, at 27. While acknowledging that families with the lowest incomes often feel the financial brunt of this congressional policy choice, the USDA assiduously acts to further that legislative policy by treating *as includible income many other routine and need-based* assistance payments which increase a family's real purchasing power. *See, e.g.,* 7 C.F.R. § 273.9(b)(2)(i) (supplemental SSI and AFDC, and "other assistance programs *based on need*" are includible in food stamp "unearned income") (emphasis added); *id.* § 273.9(b)(2)(ii) (veteran's and unemployment compensation payments); *id.* § 273.9(b)(2)(iv) (scholarships). Thus, notwithstanding the strong humanitarian preference for affording maximum nutritional benefits to needy families, it is precisely this type of policy balancing, and allocation of finite governmental resources, that *Chevron* normally ordains be left to politically accountable administering agencies rather than the courts. *See Chevron,* 467 U.S. at 866, 104 S.Ct. at 2793 ("[F]ederal judges—who have no constituency—have a duty to respect legitimate policy choices made by those who do.").

In sum, the "precise question" for determination under the *Chevron* analysis is whether the FSA evinces Congress's "specific intention" to bring HUD and FmHA UR payments within Exclusion 11. Although in my view the operative phrase "payments ... for energy assistance" is ambiguous, the very least these three impediments to a "plain" language interpretation require is careful attention to any relevant legislative history which might throw light on its meaning.

### Legislative History of FSA and Exclusion 11

The focus of the search is on any historical evidence of a specific congressional intent to classify URs as "energy assistance" payments or, alternatively, evidence that Congress left this *type* of definitional task to agency expertise. *See Chevron,* 467 U.S. at 844, 104 S.Ct. at 2782 ("Sometimes the legislative delegation to an agency on a particular question is implicit rather than explicit."). The relevant legislative history confirms that Exclusion 11 is at least ambiguous on the matter at issue. *See Dion,* 933 F.2d at 16 (looking to legislative history to confirm nonambiguity of statutory language).

I readily agree with the court that its proposed interpretation of the various pre-enactment committee reports is eminently reasonable. On the other hand, the USDA points to several references in the committee reports suggesting that Congress, *in the wake of the unprecedented OPEC oil crisis,* contemplated no exclusion from "income" for federal "energy assistance" payments to FSA recipients, *except* for "extraordinary" energy expenses not already addressed through the "ordinary mechanisms" in the FSA for accommodating normal inflationary cost-of-living increases. S.Rep. No. 394, 96th Cong., 2d Sess. 111 (1980), *reprinted in* 1980 U.S.C.C.A.N. 410, 520.

The pivotal Committee Report, H.R.Rep. No. 788, 96th Cong., 2d Sess. 122–23 (1980), *reprinted in* 1980 U.S.C.C.A.N. 843, 955–56 [hereinafter: "House Report No. 788"], *see supra* pp. 1204–05, cites to particular examples of *recently* enacted federal statutes providing "payments ... for the purpose of energy assistance." *See, e.g.,* Home Energy Assistance Act, 94 Stat. 229 (1976) (formerly codified at 42 U.S.C. §§ 8601–8612 (1976)). (repealed and reenacted as Low–Income Home Energy Assistance Act, Pub.L. No. 97–35, §§ 2601–2610, 95 Stat. 893 (1981) (codified at 42 U.S.C. §§ 8622–8629 (1982)))

[hereinafter: LIHEAA or LIHEAP]; *see also* S.Rep. No. 394, *supra* at 111 (committee report on LIHEAA). House Report No. 788 noted that the federal "intervention" payments authorized under these "new" programs had enabled low income households to "meet the *dramatic increases* in home heating costs," "to buy the same amount of energy they would have utilized in past years without having to diminish their already marginal incomes," and thereby "represent[ ] more of a wash transaction than any *real increase* in the [FSA] recipient or benefited household's *purchasing power.*" H.R.Rep. No. 788, *supra*, at 122, 1980 U.S.C.C.A.N. at 955. (emphasis added).

Although these references may not *compel* the interpretation adopted by the USDA, they surely *support* a permissible inference that this was the specific *type* of federal "energy assistance" payment targeted by Exclusion 11. Having promptly adopted this statutory gloss, both in its regulatory definition, *see* 7 C.F.R. § 273.9(c)(5) (FSA "income" includes all reimbursements for "normal household living expenses" which "do not represent a gain or benefit to the household"), and in practice, the USDA maintains that FSA income exclusions for reimbursements of *routine* energy costs would go well beyond merely holding FSA recipients "harmless," for the obvious reason that the FSA, HUD, and FmHA programs already contain mechanisms for taking into account any general inflationary energy increases (*e.g.*, FSA's "standard" and "excess shelter" deductions).

Similarly, House Report No. 788 demonstrates that Congress did not hesitate to delegate significant discretion to the USDA to determine which *state*-paid benefits are properly classified "energy assistance [payments]" under Exclusion 11, *see* H.R.Rep. No. 788, *supra*, at 123, 1980 U.S.C.C.A.N. at 956 ("provided that [the USDA] is satisfied that the increase in [state or local] benefits ... is, in fact, an energy assistance-related increase and not simply a general welfare increase") (emphasis added). Significantly, one criterion Congress established for guiding the USDA's classification of these benefits is that state benefit increases could only

be considered "energy assistance [payments]" "*to the extent* that the increase is attributable to *high* heating costs rather than general inflationary conditions." *Id.* (emphasis added).

### *"Hold Harmless" Payments*

The court offers two rejoinders to the USDA's reading of the legislative history. With respect, I believe both are flawed. First, moving beyond its questionable conclusion that nothing in House Report No. 788 *confirms* the USDA's interpretation of "energy assistance [payments]," the court states that the USDA's *policy choice* is "at odds" with the legislative history. *See supra* p. 1205. The court's statement presumably stems from two premises: (1) USDA's practice of including URs as food stamp "income" fails to hold food stamp families "harmless" by ensuring that "a household's expenditures for energy remain constant as a percentage of household income, from year to year," and (2) hypothetical UR payments might sometimes contain reimbursements for superinflationary energy cost increases, for which URs would hold tenants "harmless." In order to assess the soundness of these two premises, it is necessary first to determine what Congress meant when it said that the "new" energy programs were designed to hold recipient families "*harmless*" for "energy assistance" payments, LIHEAP being a *known type* of "new" energy assistance payment.

Congress enacted LIHEAA intending that "new" programs of its type would *supplement* preexisting governmental assistance programs which *had not* previously provided benefit adjustments to low income households to account for energy cost increases which *outpaced* general cost-of-living increases. *See* S.Rep. No. 394, *supra*, at 111, 1980 U.S.C.C.A.N. at 520 (expressing concern that "the *ordinary mechanisms* for adjusting income assistance programs to the rising costs of living may be *inadequate* to meet the *extraordinary* increases which have taken place in energy costs") (emphasis added). Thus, when enacting LIHEAA, Congress ostensibly determined that preexisting statutory mechanisms for making adjustments for "substantial [energy rate] increases," like those already incorporated in the FSA, HUD

and FmHA programs, were ill-designed to offset recent and unprecedented "spike" increases in energy costs, and opted to reimburse food stamp recipients *in full* for all otherwise unreimbursed expenditures for these past and future "spike" increases. *Cf.* 42 U.S.C. § 8624(f) (LIHEAP payments not includible as "income" in calculating food stamp entitlements). Thus, in *two* senses, food stamp recipients realized no *real* "gain" from LIHEAA: (1) LIHEAP payments merely offset superinflationary energy cost increases, and food stamp recipients were simply restored to their pre-OPEC financial position, so as to afford them the *same amount of energy* as before the oil crisis, without loss of real spending power, *and* (2) since these superinflationary energy cost increases were not being offset by any other statutory cost-of-living assistance provision, LIHEAP payments would effect no *double* compensation, or "gain," to food stamp families. In these respects, therefore, LIHEAA worked a *complete* "wash."

On the other hand, consider the following hypothetical calculations of representative housing assistance payments and URs:

|  |  | 1990 | 1991 |
|---|---|---|---|
|   | approved rent | $300 | $300 |
| + | utility allowance | $ 60 | $ 72 |
| = | approved shelter cost | $360 | $372 |
| − | 30% family income of $150 | $ 45 | $ 45 |
|   | housing assistance payment | $315 | $327 |
| − | approved rent | $300 | $300 |
|   | utility reimbursement | $ 15 | $ 27 |

The utility allowance, which may or may not reflect *actual* utility costs, is an average figure calculated by the "landlord" for all units in a covered facility, and is designed to afford tenants an "adequate" allowance for household utilities, while deterring inefficient energy usage. As the court points out, "substantial" annual increases in energy rates (*e.g.*, more than 10%) might require the "landlord" to make corresponding increases in the preset utility allowance. *See* 7 C.F.R. pt. 1930, subpt. C, exh. E.IX.C; 24 C.F.R. §§ 882.214, 965.478. So, in our hypotheticals, if utility

rates increased to $72 over one year, a 20% increase, the tenant's UR would increase from $15 to $27. If the general or across-the-board inflation rate for the same year were only 15%, then one-quarter of the $12 increase in the UR paid to the tenant, *or $3,* could be considered an additional reimbursement for utility cost increases beyond the general inflationary rate, and some lesser portion of that segregable payment of $3 would be for superinflationary *energy* (as opposed to nonenergy utility) price increases. Accordingly, our hypothetical $27 UR would include three components: basic energy cost ($15), general inflationary increase ($9), and superinflationary increase ($3).

When the identical "hold harmless" analysis just applied to LIHEAP is applied to the housing URs Congress established prior to its enactment of LIHEAA, the flaw in the thesis advanced by the court becomes clear.[8] Unlike LIHEAP payments, URs simply are *not* payments made pursuant to a "new program" as specifically referred to in House Report No. 788. [*See supra* pp. 1201–02.] For example, HUD's section 8 housing legislation was enacted in 1974, *see* P.L. No. 93–383, § 201(a), 88 Stat. 653 (1974) (codified at 42 U.S.C. § 1437f), well before Congress can reasonably be thought to have foreseen the superinflationary energy price increases experienced in the late 1970s. When URs were *first* established, therefore, Congress could not have contemplated, let alone intended, that the UR's "basic cost" component ($15) or its "general inflation" component ($9) would hold recipient families "harmless" in the *two* special senses in which LIHEAA later benefited its recipients. Prior to their initial entitlement to URs, low income families presumably paid the full $60 utility cost from income; whereas immediately after the establishment of URs, it cost the same family only $45 to purchase the *same amount* of energy it had purchased for $60 the *previous* year. Congress established the "basic cost" component in utility allowances and URs to *reduce* the percentage of household income

---

8. The court concludes that "USDA's practice of counting the energy component of [URs] as income does not hold tenants 'harmless' for the assistance they receive." *See supra* pp. 1205–06. Regardless whether this is the right answer, how-

ever, the court has not posed the right question. The appropriate inquiry is whether these HUD and FmHA *housing* programs were intended to hold families harmless in the same way LIHEAA was meant to do.

that must be expended for energy *regardless* of past inflationary trends. Thus coupled with an adequate internal mechanism for making future adjustments for general inflationary increases, the UR worked a real $15 *increase* in overall purchasing power, not merely a "wash."

At most, therefore, the court has demonstrated in theory that the USDA might be required at some time in the future to exclude a relatively small portion of some URs from food stamp "income"; *viz.*, the $3 (or less) of the hypothetical $27 UR attributable to any "superinflationary component." But this theory inevitably imports serious conceptual impediments of its own.

First, in defense of this theory the court *disregards* the *unitary* nature of UR payments, opining that the USDA can easily segregate URs into their energy and nonenergy components, thereby smoothing the path for its conclusion that the UR's energy component alone qualifies for "exclusion" from FSA "income." *See supra* p. 1202; *but cf. supra* pp. 1209–10. Having thus disregarded the unitary nature of UR payments, the court cannot then credibly suggest that the USDA would be acting arbitrarily by segregating and *excluding from FSA income* a UR's hypothetical superinflationary component ($3) while at the same time including the UR's "basic cost" ($15) and "general inflation" ($9) components in FSA income. Second, and more importantly, no part of any UR will include such a superinflationary component during periods of subinflationary, stable, or declining energy prices. Indeed, the USDA concedes that it may be appropriate to exclude from FSA income a UR which *actually* represents a reimbursement for superinflationary energy increases. Given general economic trends in the late 1980s and early 1990s, however, appellants advisedly have not argued that their own URs covered any superinflationary energy price increases, nor do they suggest that USDA has attempted to include any such superinflationary component in any other food stamp recipient's "income." Rather, the USDA continues to include HUD and FmHA URs in food stamp "income" on the theory that unless proven to contain some superinflationary component,

current HUD and FmHA URs presumably reimburse only "routine" energy costs and *subinflationary* increases in energy costs. The current USDA regulations flexibly track this presumption by reference to the includibility of all reimbursements for "normal household living expenses." As a consequence, I find no support for the thesis that the USDA's policy choice is "at odds" with the legislative history.

### State "Energy Assistance" Payments

As its second rejoinder, the court takes the position that the language quoted from House Report No. 788, *see supra* at p. 1204, considered in context, can lead to one reasonable conclusion only—that Congress was particularly concerned that "state and local governments might pass off increases in existing, nonenergy-related welfare program payments as 'energy assistance'" so as to shift local welfare burdens to federally-funded programs (*e.g.*, the FSA program). Once again, however, this thesis does not withstand close scrutiny, let alone begin to dispel the plausibility of the alternative view advanced by the USDA.

If this sort of burden shifting had indeed been a matter of significant legislative concern, it would have been a simple matter for Congress to authorize a FSA income exclusion for all *bona fide* energy cost assistance paid to food stamp recipients by the States. All Congress need have done is to require States to satisfy the Secretary that any increases in state-paid benefits were for food stamp recipients' energy cost increases, rather than their nonenergy cost increases. In addition to its threshold requirement that energy cost increases be the "but-for cause" of any increase in a state's reimbursements, however, Congress imposed a second, subsidiary condition: even a state's *bona fide* energy-related reimbursements should be exempt under Exclusion 11 "only *to the extent* that the [benefit] increase is attributable to *high heating costs* rather than *general inflationary conditions.*" The court has not explained how Congress could have meant to thwart improper diversions of State welfare program costs by prohibiting FSA income exclusions for *bona fide* subinflationary ener-

gy cost reimbursements by a State, if federal payments for the same purposes were readily excludible from food stamp income. In sharp contrast, the reading given House Report No. 788 by the USDA dovetails neatly with the stated goals of "new" federal programs, such as LIHEAA, which Congress referred to as prototypes of federal "intervention" payments for "energy assistance."

In conclusion, the USDA's interpretation is corroborated both by a reasonable reading of Exclusion 11's ambiguous language and its legislative history. There is no statutory or historical evidence whatever that Congress has evinced a "specific intention" to include HUD and FmHA URs within the Exclusion 11 language: "payment[s] ... for energy assistance." Congress has never once alluded to HUD and FmHA URs as "energy assistance [payments]," even though URs preceded the enactment of Exclusion 11 by some six years. *See, e.g.,* P.L. No. 93–383, § 201(a), 88 Stat. 653 (1974). *Chevron* deference is not dependent on a determination "that the agency construction was the *only* [permissible] one ..., or even the reading the court would have reached if the question initially had arisen in a judicial setting." *Chevron,* 467 U.S. at 843 n. 11, 104 S.Ct. at 2782 n. 11.

Notwithstanding its able effort to dispel the permeant ambiguity in the relevant legislative history, and interpret Exclusion 11 apart from its unique historical context, the court has disclosed no suggestion that Congress ever intimated its disapproval of the USDA's longstanding policy against treating routine utility reimbursements as "energy assistance [payments]." Although I recognize that "[c]ongressional *inaction* frequently betokens unawareness, preoccupation, or paralysis," *Zuber,* 396 U.S. at 185–86 n. 21, 90 S.Ct. at 323–24 n. 21, Congress has amended Exclusion 11 not once but *twice* since the USDA adopted its present policy on URs. *See, e.g., Lorillard v. Pons,* 434 U.S. 575, 580, 98 S.Ct. 866, 870, 55 L.Ed.2d 40 (1978) (noting: "Congress is presumed to be aware of an administrative ... interpretation of a statute and *to adopt that interpretation* when it re-enacts a statute without change") (emphasis added). Nevertheless, implicit in the ap-

proach adopted by the court is the impermissible presumption that on both occasions when Exclusion 11 was amended, Congress was unfamiliar with the administering agency's policy position on the very provision upon which the agency's policy depends. *See* Pub.L. No. 100–435, § 343, 102 Stat. 1647, 1663–64 (1988); S.Rep. No. 397, 100th Cong., 2d Sess. 28–29 (1988), *reprinted in* 1988 U.S.C.C.A.N. 2239, 2266–67 (designating FSA amendment as a "technical correction" which "is *not intended to change current policy*") (emphasis added). Not only is there no statutory or historical basis for this presumption but it undermines *Chevron* itself, which would otherwise require deference to the reasoned interpretation of Exclusion 11 adopted by the USDA as the FSA's administering agency.

For the foregoing reasons, I respectfully dissent.